## NEW YORK INDIANS v. UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 106. Argued March 2, 3, 1898. — Decided April 11, 1898.

The provision in the treaty of June 15, 1838, with the New York Indians, that the United States will set apart as a permanent home for them the tract therein described in what afterwards became the State of Kansas, was intended to invest a present legal title thereto in the Indians, which title has not been forfeited and has not been reinvested in the United States; and the Indians are not estopped from claiming the benefit of such reservation.

It appears by the records of the proceedings of the Senate that several amendments were there made to said treaty, including a new article; that the ratification was made subject to a proviso, the text of which is stated in the opinion of the court; and that in the official publication of the treaty, and in the President's proclamation announcing it, all the amendments except said proviso were published as part of the treaty, and it was certified that "the treaty, as so amended, is word for word as follows," omitting the proviso. *Held,* that it is difficult to see how the proviso can be regarded as part of the treaty, or as limiting at all the terms of the grant.

THIS was a petition by the Indians who were parties to the treaty of Buffalo Creek, New York, on January 15, 1838, 7 Stat. 550, to enforce an alleged liability of the United States for

1

the value of certain lands in Kansas, set apart for these Indians, and subsequently sold by the United States, as well as for certain amounts of money agreed to be paid upon their removal.

These claims were referred, under the act of March 3, 1883, known as the "Bowman Act," to the Court of Claims. That court reported its findings to the Senate, January 16, 1892, and thereupon, on January 28, 1893, Congress passed an act to authorize the Court of Claims to hear and determine these claims and to enter up judgment as if it had original jurisdiction of the case without regard to the statute of limitations. There was a further provision, that from any judgment rendered by that court, either party might appeal to the Supreme Court of the United States.

The petition, which was filed on February 10, 1893, set forth as the substance of the treaty that the claimants ceded and relinquished to the United States all their right, title and interest in and to certain lands of the claimants at Green Bay, State of Wisconsin, and in consideration of such cession and relinquishment the United States, in and by the said treaty, agreed and guaranteed as follows :

First. To set aside, as a permanent home for all of the claimants, a certain tract of country west of the Mississippi River, described by metes and bounds, and to include eighteen hundred and twenty-four thousand (1,824,000) acres of land, the same to be divided among the different tribes, nations or bands of the claimants in severalty, according to the number of individuals in each tribe, as set forth in a certain schedule annexed to the said treaty, and designated as Schedule A, upon condition that such of the claimants as should not accept, and agree to remove to the country set apart for them within five years, or such other time as the President might from time to time appoint, should forfeit to the United States all interest in the lands so set apart.

Secondly. The United States agreed to protect and defend the claimants in the peaceable possession and enjoyment of their new homes and to secure their right to establish their own government, subject to the legislation of Congress respecting trade and intercourse with the Indians.

Thirdly. The United States agreed that the lands secured to the claimants by the treaty should never be included in any State or Territory of the Union.

Fourthly. The United States agreed to pay to the several tribes or nations of the claimants, hereinafter mentioned, on their removal west, the following sums respectively, namely : To the St. Regis tribe, five thousand dollars ($5000) ; to the Seneca nation, the income annually of one hundred thousand dollars ($100,000), (being part of the money due said nation for lands sold by them in New York, and which sum they authorized to be paid to the United States) ; to the Cayugas, twenty-five hundred dollars ($2500) in cash, and the annual income of twenty-five hundred dollars ($2500) ; to the Onondagas, two thousand dollars ($2000) in cash, and the annual income of twenty-five hundred dollars ($2500) ; to the Oneidas, six thousand dollars ($6000) in cash, and to the Tuscaroras, three thousand dollars ($3000).

Fifthly. The United States agreed to appropriate the sum of four hundred thousand dollars, ($400,000) to be applied from time to time by the President of the United States for the following purposes, namely : To aid the claimants in removing to their new homes and supporting themselves the first year after their removal; to encourage and assist them in being taught to cultivate their lands ; to aid them in erecting mills and other necessary houses; to aid them in purchasing domestic animals and farming utensils and in acquiring a knowledge of the mechanic arts.

By a supplemental article the St. Regis Indians were allowed to remove to the said country if they so desired, but were exempted from obligation so to do.

The treaty of Buffalo Creek having been duly assented to by all the parties thereto, was afterwards on, to wit, the 4th day of April, A.D. 1840, duly proclaimed; and certain disputes thereunder having arisen, it was afterwards modified in some particulars not having reference to the matter of this claim, and as so modified was again proclaimed on, to wit, the 26th day of August, 1842.

The petition further alleged that at the time of the making

of the treaty of Buffalo Creek aforesaid, and for many years prior thereto, the claimants owned and occupied valuable tracts of land in the State of New York, and had improved and cultivated the same and resided thereon; and from the products thereof chiefly sustained themselves.

That the President of the United States never prescribed any time for the removal of the claimants, or any of them, to the lands, or any of them, set apart by the treaty of Buffalo Creek, and no provision of any kind was ever made for the actual removal of more than about two hundred and sixty individuals of the claimant tribes, as contemplated by the said treaty; and of this number only thirty-two ever received patents or certificates of allotment of any of the lands mentioned in the first article of the said treaty, and the land allotted to those thirty-two was at the rate of 320 acres each, or 10,240 acres in all.

That after the conclusion of the said treaty of Buffalo Creek the United States surveyed and made part of the public domain the lands at Green Bay, ceded by the claimants, and sold or otherwise disposed of and conveyed the same and received the consideration therefor.

That the lands west of the Mississippi River, secured to the claimants by the said treaty of Buffalo Creek, were set apart by the United States and designated upon the land maps thereof as the New York Indian reservation, and so remained until in, or about the year A.D. 1860, at which time the United States surveyed and made part of the public domain the lands aforesaid, and the same were sold or otherwise disposed of by the United States, which received the entire consideration therefor; and the said lands thereafter were, and now are, included within the territorial limits of the State of Kansas. The said lands at the time the same were so appropriated by the United States were of great value, to wit, of the value of one dollar and twenty-five cents ($1.25) per acre and upwards.

That the action of the United States in appropriating the said lands as aforesaid was in pursuance of the proclamations of the President, of date December 3 and 17, 1860, and grew

out of an order of the Secretary of the Interior of the 21st day of March, A.D. 1859; and between the said last-mentioned date and the proclamation of the said lands aforesaid the claimants employed counsel to protect and prosecute their claims in the premises, and asserted that the United States had seized upon the said lands contrary to the obligations of the said treaty, and would not permit the said claimants to occupy the same or make any disposition thereof, and the claimants have steadily since asserted said claim in the premises.

That of the sum of $400,000, agreed by the treaty of Buffalo Creek to be appropriated by the United States for the purposes aforesaid, only the sum of $20,477.50 was ever so appropriated, except as hereinafter stated, and of this sum only $9464.08 was actually expended.

The petition further alleged that the Tonawanda band had been paid $256,000 for their interest in the land; that settlement had also been had with the Senecas, and that a special act had been passed authorizing the Court of Claims to find the facts and enter up judgment, without interest, and that the statute of limitations should not be pleaded as a bar to any recovery.

The petition concluded with a demand for a judgment for the value of the lands and for the amounts that were to be paid in cash.

The Court of Claims found the facts stated in the margin,[1]

---

[1] FINDINGS OF FACT.

1. In 1780 the Six Nations of "New York Indians" consisted of the following nations or tribes: Senecas, Cayugas, Onondagas, Oneidas, Tuscaroras and Mohawks. The Mohawks soon after withdrew to Canada, relinquishing to New York all claim to lands in that State.

The court decide that the Indians described in the jurisdictional act sending this case to this court as " the New York Indians, being those Indians who were parties to the treaty of Buffalo Creek, New York, on the 15th of January, 1838," were the following: Senecas, Onondagas, Onondagas residing on the Seneca reservation, Onondagas at Onondaga, Cayugas, Cayugas residing on the Seneca reservation, Cayuga Indians residing in the State of New York, Tuscaroras, Tuscaroras residing in the State of New York, Oneidas residing in New York, at Green Bay (Wisconsin), and in the

together with others which are not deemed material to the consideration of the case, and also found as a conclusion of law from these facts that the petition should be dismissed, whereupon the claimants appealed to this court.

---

Seneca reservation, Oncidas, St. Regis, St. Regis in New York, the American party of the St. Regis residing in the State of New York, Stockbridges, Munsees, Brothertowns.

2. Some of the New York Indians between 1810 and 1816 petitioned the President of the United States for leave to purchase reservations of their Western brethren with the privilege of removing to and occupying the same without changing their existing relations and treaties with the government or their right to the annuities promised in those treaties. (February 12, 1816, the Secretary of War, by authority of the President, gave his permission.) In 1820 and 1821 defendants aided some ten Indians, representing plaintiffs, in exploring certain parts of Wisconsin with a view to making arrangements with the Indians residing there for a portion of their country to be inhabited by such of the Six Nations as might choose to emigrate thither. Among the petitioners for leave to purchase reservations were the Onondagas, Senecas, Cayugas and Oneida nations of New York Indians.

August 18, 1821, the Menominees and Winnebago nations, in consideration of $2000, chiefly in goods, ceded, released and quitclaimed all their right, title and claim in certain lands near Green Bay, Wisconsin, amounting to about 500,000 acres, to the Six Nations and the St. Regis, Stockbridge and Munsee tribes, reserving the right of fishing and the right to occupy "a necessary proportion of the lands for the purposes of hunting, provided that in such use and occupation no waste or depredation should be committed on lands under improvement."

The President's approval of the arrangement found in the treaty of August 18, 1821, was signified February 19, 1822, as follows :

"The within arrangement, entered into between the Six Nations, the St. Regis, Stockbridge and Munsee nations, of the one part, and the Menominees and Winnebagoes of the other, is approved, with the express understanding that the lands thereby conveyed to the Six Nations, the St. Regis, Stockbridge and Munsee nations are to be held by them in the same manner as they were previously held by the Menominees and Winnebagoes.

                                                "JAMES MONROE.

"February 19, 1822."

The $2000 above mentioned was thus paid : In goods, $900 from the Stockbridges, $400 from the Oneidas, $200 from the Tuscaroras; in cash, $500. The Senecas subsequently denied that they had any title to any lands in Wisconsin. It does not appear that the Cayugas or Onondagas claimed any interest in the lands prior to 1860.

3. Permission to secure an extension of the cession in the preceding

*Mr. Joseph H. Choate* for appellants. *Mr. Henry E. Davis, Mr. Guion Miller, Mr. George Barker, Mr. James B. Jenkins* and *Mr. Jonas H. McGowan* were with him on the brief.

---

finding recited was given by the Secretary of War, and thereafter, on September 23, 1822, the Menominees, in consideration of $3000 in goods, made a similar cession of another tract containing at least 5,000,000 acres, rather undefined, (adjoining the above,) to the Stockbridge, Oneida, Tuscarora, St. Regis and Munsee nations, the releasees promising, however, that the releasors should " have the free permission and privilege of occupying and residing upon the lands " in common with the former.

The President's approval was given March 13, 1823, as follows :

" The foregoing instrument is approved, so far as it conveys to the Stockbridge, Oneida, Tuscarora, St. Regis and Munsee tribes or nations of Indians that portion of the country therein described which lies between Sturgeon Bay, Green Bay, Fox River ; that part of the former purchase made by said tribes or nations of Indians of the Menominee and Winnebago Indians on the 8th of August, 1821, which lies south of Fox River and a line drawn from the southwestern extremity of said purchase to the head of Sturgeon Bay, and no farther; that quantity being deemed sufficient for the use of the first before-mentioned tribes and nations of Indians. It is to be understood, however, that the lands, to the cession of which to the tribes or nations aforesaid the government has assented, are to be held by them in the same manner as they were held by the Menominees previous to concluding and signing the aforegoing instrument, and that the title which they have acquired is not to interfere in any manner whatever with the lands previously acquired or occupied by the government of the United States or its citizens."

October 27, 1823, the Secretary of War officially notified the releasees that the President distinctly wished them to understand that by this partial sanction he did not mean to interfere with, nor in any manner invalidate, their title to all the lands which they had thereby acquired, including those not confirmed by the government, but, on the contrary, he considered their title to every part of the country conveyed to them by the releasors as equally valid as against them; and that what they had done was with the full assent of the government.

Of the consideration above mentioned, $1000 were paid by the Stockbridges and Munsees, while $1000 were to be paid by the Oneidas, Tuscaroras and St. Regis in one year from September 23, 1822, and $1000 in two years from that date. Of the two latter amounts $1000 appears to have been paid by the United States out of the funds of the St. Regis about 1825, while $950 were paid by the Brothertown tribe September 18, 1824. In consideration of which the releasees, by an agreement with the Brothertowns, under date of January 8, 1825, ceded to them a small separate tract by metes and bounds, and, after reserving to themselves, for each tribe of the releasees,

*Mr. Charles C. Binney* for appellees.  *Mr. Assistant Attorney General Pradt* was on his brief.

Mr. JUSTICE BROWN delivered the opinion of the court.

---

a similar tract from out the country purchased from the releasors, granted to the Brothertowns an equal, undivided part of all the remaining portion of said purchase. It does not appear whether the Oneidas and Tuscaroras paid any part of the above consideration.

4. The grants set forth in findings 2 and 3 include the lands subsequently ceded by the Menominees to the United States by the treaties of August 11, 1827, and February 8, 1831.

5. Thereafter some New York Indians, belonging to the Oneida, St. Regis, Stockbridge, Munsee and Brothertown tribes, removed to and took possession of the lands in Wisconsin.

Later, and after 1832, another small portion of the New York Indians removed to the Wisconsin or Green Bay lands.

March 14, 1840, the Senecas denied ownership of Wisconsin lands, stating that they determined to have no other home than that of their fathers where they then resided, and, in May and September following, in petitions to the President, the Senate and the House of Representatives, their council denied that they were parties to the treaty.

6. It does not appear that application was made by the tribes or bands, or any of them, to the government, for removal to the Kansas lands provided for in the Buffalo Creek treaty, except as hereafter appears in these findings.

It does not appear that any substantial number of Indians wished to go to Kansas other than those who made up the Hogeboom party (*infra*).

7. In the year 1838, at the time of the negotiation of the treaty of Buffalo Creek, the Senecas, the Onondagas, the Oneidas, the Cayugas, the Tuscaroras and the St. Regis each possessed a reservation of land in the State of New York on which members of the tribes resided, and the right of occupancy of which was secured to them by treaty stipulations. The Cayuga Indians had no separate reservation of their own in the State of New York, but made their home with and resided upon the reservation and lands possessed by the Seneca nation; this they did with the consent of the Senecas, and a portion of the Onondagas did the same.

(The eighth finding is immaterial.)

9. For many years prior to the treaty of Buffalo Creek (of 1838) these nations or tribes of Indians had improved and cultivated their lands, on which they resided and from the products of which they chiefly sustained themselves.

The treaty of Buffalo Creek, as printed in the seventh volume of the Statutes at Large, contains a misprint on the third line of page 556. The word "Oneidas" is in the original treaty "Onondagas," the whole line reading, "Onondagas residing on the Seneca reservation."

Opinion of the Court.

The facts in this case are somewhat complicated, but the real question involved is whether the cessions of the Kansas lands to these Indians ever took complete effect, or whether the failure, or rather the refusal, of the Indians to remove to

10. *Extract from Executive Journal of June* 11, 1838.

The Senate resumed as in Committee of the Whole the consideration of the treaty with the New York Indians, and the article supplemental thereto.

On motion of Mr. Wright, and by unanimous consent, the question was taken on agreeing to the amendments reported from the Committee on Indian Affairs, and determined in the affirmative, yeas 33.

   *    *    *    *    *    *

No further amendments having been made, the treaty was reported to the Senate, and the amendments were unanimously concurred in.

Mr. White then submitted the following resolution of ratification, embracing the amendments as reported from the committee and adopted by the Senate:

*Resolved, (two-thirds of the Senators present concurring,)* That the Senate advise and consent to the ratification of the treaty made and concluded at Buffalo Creek, in the State of New York, the 15th day of January, in the year of our Lord 1838, by Ransom H. Gillett, a commissioner on the part of the United States, and the chiefs, headmen and warriors of the several tribes of the New York Indians, assembled in council, with the following amendments.

(Here follows a series of amendments striking out original articles 3, 4, 5, 6, 9 and 19, striking out particular words and clauses from other articles, inserting new article 15, and concluding as follows:)

*Resolved, further, (two-thirds of the Senators present concurring,)* That the Senate advise and consent to the ratification of the supplemental article to the treaty concluded at Buffalo Creek, in the State of New York, January 15, 1838, which was made at the council-house of St. Regis on the 13th day of February, 1838 : *Provided,* The chiefs and headmen of the St. Regis Indians, residing in New York, will in general council accept of and adopt the aforesaid treaty, as modified by the preceding resolution of ratification.

*Provided always, and be it further resolved, (two-thirds of the Senate present concurring,)* That the treaty shall have no force or effect whatever, as it relates to any of said tribes, nations or bands of New York Indians, nor shall it be understood that the Senate have assented to any of the contracts connected with it until the same, with the amendments herein proposed, is submitted and fully and fairly explained by a commissioner of the United States to each of said tribes or bands, separately assembled in council, and they have given their free and voluntary assent thereto; and if one or more of said tribes or bands, when consulted as aforesaid, shall freely assent to said treaty as amended, and to their contract connected therewith, it shall be binding and obligatory upon those so assenting, although other or others

Opinion of the Court.

the lands set apart for them within five years, worked *ipso facto*, under the third article of the treaty, a forfeiture of their interest.

1. So far as concerns the legal aspects of the case, it is

---

of said bands or tribes may not give their assent, and thereby cease to be parties thereto: *Provided, further*, That if any portion or part of said Indians do not emigrate the President shall retain a proper proportion of said sum of four hundred thousand dollars, and shall also deduct from the quantity of land allowed west of the Mississippi such number of acres as will leave to each emigrant three hundred and twenty acres only.

The Senate proceeded, by unanimous consent, to the consideration of said resolutions.

On the question to agree thereto,

It was determined in the affirmative, { Yeas ....................... 33
                                       { Nays ....................... 2

*　　　*　　　*　　　*　　　*　　　*　　　*

Ordered, that the secretary lay this resolution before the President of the United States.

*　　　*　　　*　　　*　　　*　　　*　　　*

*Proclamation of the Treaty of Buffalo Creek.*

Martin Van Buren, President of the United States of America, to all and singular to whom these presents shall come, Greeting:

Whereas a treaty was made and concluded at Buffalo, in the State of New York, on the fifteenth day of January, one thousand eight hundred and thirty-eight, by Ransom H. Gillet, a commissioner on the part of the United States, and the chiefs, headmen and warriors of the several tribes of the New York Indians, assembled in council;

And whereas the Senate did, by a resolution of the eleventh of June, one thousand eight hundred and thirty-eight, advise and consent to the ratification of said treaty with certain amendments, which treaty so amended is word for word as follows, to wit. . . .

And whereas the Senate did, on the 25th of March, one thousand eight hundred and forty, resolve " that in the opinion of the Senate the treaty between the United States and the Six Nations of New York Indians, together with the amendments proposed by the Senate of the 11th of June, 1838, have been satisfactorily acceded to and approved of by said tribes, the Seneca tribe included, and that in the opinion of the Senate the President is authorized to proclaim the treaty as in full force and operation :"

Now, therefore be it known that I, Martin Van Buren, President of the United States of America, do, in pursuance of the resolutions of the Senate of the eleventh of June, one thousand eight hundred and thirty-eight, and twenty-fifth day of March, one thousand eight hundred and forty, accept; ratify and confirm said treaty, and every article and clause thereof.

In testimony whereof I have caused the seal of the United States to be hereunto affixed, having signed the same with my hand.

Opinion of the Court.

unnecessary to inquire whether the government received from the Indians an adequate consideration for its reservation to them of the lands in Kansas. The findings upon this point are in substance that some of the New York Indians, between

---

Done at this city of Washington this fourth day of April, one thousand eight hundred and forty, and of the Independence of the United States the sixty-third. M. VAN BUREN.

By the President:

[SEAL.] JOHN FORSYTH,
*Secretary of State.*

11. The President of the United States never prescribed any time for the removal of the claimants or any of them to the lands or any of them set apart by the treaty of Buffalo Creek further than is shown in these findings.

Many of the Indians have protested against any removal. The Onondagas have officially declared that they would not remove, and treaties subsequent to that of 1838 appear in the statutes in relation to this subject-matter. The Tuscaroras still occupy their reservation in New York.

After the amended treaty had been assented to, the Senecas, the Cayugas and the Onondagas residing with them, and the Tuscaroras, continued to protest against the treaty, the Senecas asserting that their declaration of assent was invalid, and that they would never emigrate but on compulsion, and requesting (as did also some Onondaga chiefs) that no appropriation be made to carry the treaty into effect. These protests were continued even after the treaty was ratified and until the treaty of May 20, 1842, was made. More than five years from the ratification of the treaty of Buffalo Creek the Tuscarora chiefs declared that the tribe would not part with its reservation nor remove from it, whatever a few individuals might do. The Indian protests against the treaty were based upon the following allegations: (*a*) That the treaty had been brought about by corrupt means operating upon Indians of influence in their tribes, and put in motion by an agent of the preëmption owners: (*b*) that a considerable majority of the Indians wished to remain in New York.

After the treaty of May 20, 1842, was ratified, the lands and improvements on the Buffalo Creek reservation in New York were appraised, and the Indians thereon gradually withdrew to the Cattaraugus and Alleghany reservations in New York.

12. Prior to November 24, 1845, some of the New York Indians had applied to the Indian Office for the proper steps to be taken for their emigration. It was not deemed expedient to enter into any arrangements for this purpose until the department believed that a sufficient number to justify the expenditure incident to the appointment of an agent was prepared to remove.

No provision was made for the actual removal of more than about 260 individuals of the claimant tribes as contemplated by the treaty of Buffalo

1810 and 1816, with the permission of the President and with some actual aid from the government in making explorations, bought of the Menominee and Winnebago nations all their right, title and claim to about 500,000 acres of land in Wis-

---

Creek and as shown below. Of this number only 32 ever received patents or certificates of allotment of the lands mentioned in the first article of the treaty, and the amount allotted to those 32 was at the rate of 320 acres each, or 10,240 acres in all.

In 1845 Abram Hogeboom represented to the government of the United States that a number of the New York Indians, parties to the treaty of 1838, desired to remove to the Kansas lands, and upon such representation, and in conformity with such desire, said Hogeboom was appointed special agent of the government to remove the said Indians to Kansas.

The sum of $9,464.08 of an amount appropriated by Congress was expended in the removal of a party of New York Indians under Hogeboom's direction in 1846.

From Hogeboom's muster-roll, in the Indian Office, it appears that 271 were mustered for emigration. The roll shows that of this number 73 did not leave New York with the party; 191 only arrived in Kansas, June 15, 1846; 17 other Indians arrived subsequently; 82 died and 94 returned to New York.

It does not appear that any of the thirty-two Indians to whom allotments were made settled permanently in Kansas.

13. A council of the Senecas, the Cayugas and Onondagas living with them, and the Tuscaroras was called by the Indian Commissioner, to be held at Cattaraugus, June 2, 1846, to learn the final wishes of the Indians as to emigration. The commissioner who was sent on the part of the United States reported that the meeting was well attended, but that the chiefs were unanimous in the opinion that scarcely any Indians who wished to emigrate remained. The commissioner also reported that he held an enrollment for two full days, but that only seven persons requested to be enrolled for emigration, and these vouched for five more as wishing to go.

14. The United States, after the conclusion of the treaty of Buffalo Creek, surveyed and made part of the public domain the lands at Green Bay ceded by the claimants, and sold or otherwise disposed of and conveyed the same and received the consideration therefor, except as in these findings shown to the contrary. The reservation to "the first Christian and Orchard parties of Oneida Indians," which was set aside for them by defendants at Green Bay, Wisconsin, contained 65,540 acres, all of which has been allotted in severalty and reserved for school purposes except 84.08 acres.

The Stockbridge Indians acquired a reservation in Wisconsin of 11,803 acres, some of which has been allotted in severalty. (9 Stat. L. 955; 11 Stat. L. 663, 679; 16 Stat. L. 404.) The United States never acquired any lands in the State of New York from the Indians of that State. The lands ceded in that State by the Indians thereof were ceded for consideration to the

consin in consideration of $2000, chiefly in goods. This pur-
chase was made for the benefit of the Six Nations and the
St. Regis, Stockbridge and Munsee tribes.

Under a similar permission given by the Secretary of War,

State or to the Ogden Land Company, so called. There may have been
some small cessions to individuals, but there were none to the United
States.

15. Upon the ratification of the Oneida treaty of February 3, 1838, the
present Oneida reservation in Wisconsin was surveyed, containing about
65,000 acres. After the ratification of the treaty of Buffalo Creek the
United States surveyed, made part of the public domain, and sold or other-
wise disposed of the tract at Green Bay, the Indian title to which had been
ceded by that treaty, except the said Oneida reservation. This was treated
as if it had been the reservation excepted from the cession in article 1 of
that treaty, which latter reservation was never surveyed, and the bounds of
which as given in the said article are not the same as those of the former
reservation, although the two reservations cover for the most part the same
ground and are of about the same area.

The lands west of the Mississippi secured to the claimants by the treaty
of Buffalo Creek have been since that treaty surveyed and made a part of
the public domain and sold or otherwise disposed of by the United States,
which received the consideration therefor; and the said lands were there-
after and now are included within the territorial limits of the State of Kansas.
The price realized by the United States for such of said lands as were sold
at the rate of $1.34 per acre, while the cost of surveying, etc., the same was
at the rate of about 12 cents per acre, making the net price realized by the
United States about $1.22 per acre.

16. By treaty with the Tonawanda band of the Senecas, numbering 650
individuals, the United States, November 5, 1857, in consideration of cer-
tain releases of claims under the treaties of 1838 and 1842, agreed to pay and
invest, and did pay and invest, for said band the sum of $256,000.

The sum of $256,000 was equivalent to $1 per acre for the lands in Kan-
sas to which the Tonawandas would have been entitled had they all emi-
grated under the treaty of Buffalo Creek, and also to a part of the sum of
$400,000 proportioned to their numbers as compared with the whole number
of New York Indians, according to the schedule in the treaty. A portion
of the fund, all of which was paid and invested as agreed, was applied to
the purchase in fee of 7,549.73 acres of the Tonawanda reservation in New
York for the tribe's benefit, and the Tonawandas still reside thereon.

17. After March 21, 1859, an order of the Secretary of the Interior was
made which directed that the tract of land in Kansas Territory known as
the New York Indian reserve be surveyed, with a view of allotting a half
section each to such of the New York Indians as had removed there under
treaty provisions, after which the residue was to become public domain.
Thirty-two New York Indians were found to be resident on the land, and

and on September 23, 1822, the Menominees, in consideration of $3000 in goods, made a similar cession of another tract, containing about 5,000,000 acres, to the Stockbridge, Oneida, Tuscarora, St. Regis and Munsee nations. Both of these cessions were approved by the President. Thereafter, some of the New York Indians removed to and took possession of the lands in Wisconsin.

It seems, however, that the Menominees were dissatisfied with and repudiated the arrangement, and thereupon entered into two treaties with the United States, by the first of which (August 11, 1827, 7 Stat. 303) they agreed to refer the matter to the President, and by the second of which (February 8, 1831, 7 Stat. 342) protesting that they were under no obligations to recognize any claim of the New York Indians to any portion of their country, they agreed to set apart as a home for the several tribes of the New York Indians about 500,000 acres of land, for which the United States agreed to pay them $20,000, to be applied to their use. By these treaties a large quantity of other lands was also ceded by the Menominees directly to the United States, three townships of which were set aside for the Stockbridges, Munsees and Brothertowns.

It sufficiently appears from this statement that the Indians were possessed of some sort of title or interest in a large quantity of lands in Wisconsin, which the government was desirous of acquiring, and for which it was willing to make a large cession in the then unnamed, almost unknown, and wholly unsettled Territory, which was subsequently admitted to the Union as the State of Kansas. The consideration was evidently treated as a valuable one, and whether adequate or not would have been sufficient to support a deed between pri-

---

allotments were made to them. After this and before the proclamation of the President of said lands as part of the public domain (December 3 and 17, 1860,) some of the New York Indians employed counsel to protect and prosecute their claims in the premises, asserting, in the powers of attorney, that the United States had seized upon the said lands, contrary to the obligations of said treaty, and would not permit the said Indians to occupy the same or make any disposition thereof. The said Indians have since asserted their said claims.

(The remaining findings are deemed to be immaterial.)

vate parties. Probably, however, the main inducement to the cession was the agreement of the Indians to remove beyond the Mississippi, and whether the agreement of the government to set apart for them a permanent home in this Territory was supported by any other consideration which would be deemed a valuable one between private parties, is wholly immaterial so far as the treaty obligations of the Government are concerned.

2. The first and one of the most important questions in the case turns upon the nature of the title acquired by the Indians under the treaty. Was it a grant *in præsenti,* or merely an agreement to set apart for the Indians at some future time the lands in question, provided that they would remove thither within the five years fixed by the third article of the treaty?

By the first article "the several tribes of New York Indians . . . *hereby cede and relinquish* to the United States all their right, title and interest to the lands secured to them at Green Bay;" and by the second article "in consideration of the above cession and relinquishment, . . . the United States *agree to set apart*" a tract of country, containing 1,824,000 acres of land, described by metes and bounds, "as a permanent home for all the New York Indians, . . . to have and to hold the same in fee simple to the said tribes or nations of Indians, by patent from the President of the United States, issued in conformity with the provisions of the third section" of the act of May 28, 1830, "with full power and authority in the said Indians to divide said lands among the different tribes, nations or bands in severalty, with the right to sell and convey to and from each other." By the third article "such of the tribes of the New York Indians as do not accept and agree to remove to the country set apart for their new homes within five years . . . shall forfeit all interest in the lands so set apart to the United States."

The proper construction to be placed upon similar clauses was the subject of consideration by this court in several cases before the railroad land grant cases, and the conclusion reached that if, from all the language of the statute or treaty,

it was apparent that Congress intended to convey an immediate interest, it will be construed as a grant *in præsenti*.

In the case of *Rutherford* v. *Greene*, 2 Wheat. 196, 198, the State of North Carolina passed an act in 1782 "for the relief of the officers and soldiers in the continental line," and in the fifth section enacted that 25,000 acres of land " *shall be allotted* *for, and given to*, Major General Nathanael Greene, his heirs or assigns, within the bounds of the land reserved for the use of the army, to be laid off by the aforesaid commissioners;" and a further section (seventh) provided that the commissioners should " grant certificates to such persons as shall appear to them to have a right to the same." It was contended on the part of the appellant that these words gave nothing; that they were in the future and not in the present tense, and indicated an intention to give in future, but created no present obligation on the State nor present interest in General Greene. But it was held that, as the act was to be performed in future, the words directing it were necessarily in the future tense, and that, although the land was undefined, the survey afterwards made in pursuance of the act gave precision to the title and attached it to the land surveyed.

In reply to the argument that to make this an operative gift the words " are hereby given " should have been used, Mr. Chief Justice Marshall observed : " Were it even true that these words would make the gift more explicit, which is not admitted, it surely cannot be necessary now to say that the validity of a legislative act depends, in no degree, on its containing the technical terms used in a conveyance. Nothing can be more apparent than the intention of the legislature to order their commissioners to make the allotment, and to give the land, when allotted, to General Greene."

This case was followed in *United States* v. *Brooks*, 10 How. 442, in which a treaty with the Caddo Indians provided that certain persons " *shall have their right* to the said four leagues of land reserved for them, and their heirs and assigns forever. The said lands to be taken out of the lands ceded to the United States by the said Caddo nation of Indians, as expressed in the treaty to which these articles are supple-

mentary, and the four leagues of land *shall be laid off*," etc. It was held that these words gave to the reservees a fee. simple to all rights which the Caddoes had in those lands, as fully as any patent from the government could make one.

*Fremont* v. *United States*, 17 How. 542, was a case of a Mexican grant of a tract of land known as "Las Mariposas," within certain undefined boundaries. The grant was of ten square leagues, subject to certain conditions, and was to be made definite by a future survey. The grant purported to convey a present and immediate interest, in consideration of previous public services, and it was decided to be *in præsenti* upon the authority of *Rutherford* v. *Greene*, 2 Wheat. 196.— that the conditions were conditions subsequent, but that noncompliance with them did not amount to a forfeiture of the grant. Two members of the court dissented, being of opinion that the case was controlled by those of *United States* v. *Boisderé*, 11 How. 63, 96; *Glenn* v. *United States*, 13 How. 250, 259, and *Vilemont* v. *United States*, 13 How. 261.

In the cases arising under the railroad land grants, of which *Schulenberg* v. *Harriman*, 21 Wall. 44, is a leading one, the language of the granting clause was in the present tense, "*there be, and hereby is, granted*," etc.; and it has always been held that these were grants *in præsenti*, although the lands could not be identified until the map of the definite location of the road was filed, when the title, which was previously imperfect, acquired precision and became attached to the land. The doctrine of this case has been affirmed so many times that the question is no longer open to argument here. *Lessieur* v. *Price*, 12 How. 59; *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733; *Missouri, Kansas & Texas Railway Co.* v. *Kansas Pacific Railway*, 97 U. S. 491; *Railway Company* v. *Alling*, 99 U. S. 463, 475; *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad*, 139 U. S. 1; *Deseret Salt Company* v. *Tarpey*, 142 U. S. 241.

The same doctrine has also been applied to grants of swamp and overflowed lands by the acts of September 28, 1850, and June 10, 1852. *Railroad Company* v. *Smith*, 9 Wall. 95; *Wright* v. *Roseberry*, 121 U. S. 488.

One or two cases, which apparently hold a contrary doctrine, are readily reconcilable. That of *Heydenfeldt* v. *Daney Gold & Silver Mining Co.*, 93 U. S. 634, arose under the school land grant contained in the act of March 21, 1864, c. 36, enabling the people of Nevada to form a state government. 13 Stat. 30. The seventh section of the act provided "that sections numbered 16 and 36 in every township . . . *shall be, and are hereby, granted,* to said State." These words were held, under the peculiar language of the act, not to constitute a grant *in præsenti,* but an inchoate and incomplete grant until the premises were surveyed by the United States, and the survey properly approved. "We do not seek," said the court, "to depart from this sound rule;" (in *Schulenberg* v. *Harriman,*) "but, in this instance, words of qualification restrict the operation of those of present grant." "A grant, operating at once, and attaching prior to the surveys by the United States, would deprive Congress of the power of disposing of any part of the lands in Nevada, until they were segregated from those granted. . . . Until the *status* of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them."

In *Hall* v. *Russell,* 101 U. S. 503, the language of the grant was "that *there shall be, and hereby is,* granted to every white settler or occupant of the public lands," and it was held that, as the land was not identified and the grantee was not named, there could not be a present grant. "There cannot be a grant unless there is a grantee, and consequently there cannot be a present grant unless there is a present grantee. If, then, the law making the grant indicates a future grantee and not a present one, the grant will take effect in the future and not presently. In all the cases in which we have given these words the effect of an immediate and present transfer, it will be found that the law has designated a grantee qualified to take, according to the terms of the law, and actually in existence at the time."

In the case of *Rice* v. *Railroad Co.,* 1 Black, 358, the granting clause of the act was in the present tense, but there was a further clause expressly declaring that no title should vest nor

any patent issue till certain portions of the road had been completed.

From this summary of cases it is evident that the language of the granting clause is not conclusive, but the intent of Congress must be gathered from the whole scope of the instrument, and the facts to which it was intended to apply. Applying the principle of the cases above cited to the one under consideration, we are of the opinion that the grant in question was intended to invest a present legal title in the Indians, for the following reasons:

First. There is no doubt that the cession by the Indians of their interest in the Wisconsin lands, in the first article of the treaty, was an absolute, unconditional and immediate grant, and it is improbable that the Indians would have consented, or that the United States would desire, that they should accept from the Government a mere promise to set apart for them in the future the tract in Kansas. If we are to adopt such a construction it would follow that the title of the Indians, not only to the tract in Kansas, but to the lands in Wisconsin, was made dependent upon their removal to their new home. While it might be reasonably contended that their failure to remove should result in a cancellation of the treaty and a restoration to them of their rights in the Wisconsin lands, that construction is precluded by the language of the first article, which contains a present and irrevocable grant of the Wisconsin lands, and puts it beyond their power to revoke the bargain. The object of the treaty was evidently to effect an exchange of lands in pursuance of the act of May 28, 1830, c. 148, 4 Stat. 411, the third section of which provides "that in the making of any such exchange or exchanges it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made that the United States will forever secure and guaranty to them and their heirs or successors the country so exchanged with them; and, *if they prefer it,* that the United States will cause a patent or grant to be made and executed to them for the same: *Provided always,* That such lands shall revert to the United States if the Indians become extinct or abandon the same."

Second. The lands covered by the treaty were identified, described by metes and bounds, and an appropriation was made to aid in the immediate removal of the Indians to their new home.   There was no uncertainty as to the lands granted, or as to the identity of the grantees, which, in the case of *Heydenfeldt* v. *Daney Mining Co.,* 93 U. S. 634, was held to turn it into a grant *in futuro.*

Third. While the granting clause is in the future tense, an agreement to set apart, the *habendum* clause is in the present tense : " To have and to hold the same in fee simple to the said tribes, or nations of Indians, by patent from the President of the United States, issued in conformity with the provisions of the third section of the act entitled ' An act to provide for an exchange of lands with the Indians residing in any of the States or Territories, and for their removal west of the Mississippi,' approved on the 28th day of May, 1830, with full power and authority in the said Indians to divide said land among the different tribes, nations or bands, in severalty, with the right to sell and convey to and from each other."   The object of the *habendum* clause is said to be " to set down again the name of the grantee, the estate that is to be made and limited, or the time that the grantee shall have in the thing granted, or demised, and to what use."   Sheppard's Touchstone, 74. It may explain, enlarge or qualify, but cannot contradict, or defeat, the estate granted by the premises, and where the grant is uncertain, or indefinite concerning the estate intended to be vested in the grantee, the *habendum* performs the office of defining, qualifying or controlling it.   Jones on Real Prop. § 563 ;  Devlin on Deeds, § 215.

In this case if the *habendum* clause were alone considered, there could be no doubt whatever that the Indians would take a present title to a fee simple.   There is certainly no conflict between the granting and *habendum* clauses.   Admitting that the former, if standing alone, would engender a doubt as to when the grant should take effect, the *habendum* clause removes that doubt, and imports a present surrender of a defined tract.   The addition of the words, " by a patent from the President of the United States," is immaterial, since it refers

to, and is intended to be construed in connection with the third section of the act of May 28, 1830, in which the issue of a patent is merely spoken of as an optional or preferential method of acquiring full title to the land.

Fourth. By Article X a special provision was made for the Senecas by which the easterly part of the tract was set apart for them, and a deed made by them of their New York lands to Ogden and Fellows was recognized and approved of by the Government, and the consideration invested for their use. And by Article XIV another special tract of the lands granted was set off for the Tuscaroras, who conveyed to the United States 5000 acres of land in New York to be held in trust for them, and another deed to Ogden and Fellows of lands in New York was assented to and sanctioned by the Government.

These proceedings, by which these tribes divested themselves of their title to lands in New York, indicate an intention on the part, both of the Government and the Indians, that they should take immediate possession of the tracts set apart for them in Kansas.

3. There is, however, another consideration which must not be overlooked in this connection, and which raises the only difficult point in the interpretation of the treaty. It is found by the court below (finding 10) that, when the treaty was laid before the Senate for ratification, June 11, 1838, the third, fourth, fifth, sixth, ninth and nineteenth of the original articles were stricken out, several others were amended by eliminating particular clauses, a new article was added as Article XV, and the ratification made subject to the following condition:

"*Provided always, and be it further resolved, (two-thirds of the Senate present concurring,)* That the treaty shall have no force or effect whatever, as it relates to any of said tribes, nations or bands of New York Indians, nor shall it be understood that the Senate have assented to any of the contracts connected with it until the same, with the amendments herein proposed, is submitted and fully and fairly explained by a commissioner of the United States to each of said tribes or bands, separately assembled in council, and they have given

their free and voluntary assent thereto; and if one or more of said tribes or bands, when consulted as aforesaid, shall freely assent to said treaty as amended, and to their contract connected therewith, it shall be binding and obligatory upon those so assenting, although other or others of said bands or tribes may not give their assent, and thereby cease to be parties thereto : *Provided further,* That if any portion or part of said Indians do not emigrate the President shall retain a proper proportion of said sum of four hundred thousand dollars, and shall also deduct from the quantity of land allowed west of the Mississippi such number of acres as will leave to each emigrant three hundred and twenty acres only."

Now, if the above proviso (that if any portion or part of said Indians do not emigrate, the President shall . . . deduct from the quantity of land allowed west of the Mississippi such numbers of acres as will leave to each emigrant 320 acres only) be considered a part of the treaty and to be respected as such, it would be difficult to avoid the conclusion that the grant of Kansas lands was not intended to take immediate effect, since the power to *deduct* (differing in that respect from the power to *forfeit* contained in the third article) would show an intention that the grant as a whole should not take immediate effect, and would imply that it was extended only to 320 acres to each emigrant. If the allotment is to be treated as one of 320 acres for each emigrant and not of the entire tract as specified in article two, the residue, of course, belongs to the Government.

But did this resolution ever become operative? It is not found in the original nor in the published copy of the treaty, nor in the proclamation of the President, which recites that the Senate did, by a resolution of the 11th of June, 1838, "advise and consent to the ratification of said treaty with certain amendments; *which treaty, as so amended, is word for word as follows,* to wit:" (Here follows a copy of the treaty as published in 7 Stat. 550.) But no allusion is here made to the final resolution or its proviso. This is the more remarkable, as every other amendment made by the Senate appears in the treaty as published, while no reference what-

ever is made to this — the reason probably being that the resolution was mainly directory in its character, requiring that the treaty be fully and fairly explained by the commis- sioner to each of the tribes separately assembled in council, and that they should give their free and voluntary assent thereto. The proviso may also have been well considered as merely directory to the President, but in any event it is diffi- cult to see how it can be regarded as part of the treaty or as limiting at all the terms of the grant.

The power to make treaties is vested by the Constitution in the President and Senate, and, while this proviso was adopted by the Senate, there is no evidence that it ever received the sanction or approval of the President. It cannot be consid- ered as a legislative act, since the power to legislate is vested in the President, Senate and House of Representatives. There is something, too, which shocks the conscience in the idea that a treaty can be put forth as embodying the terms of an ar- rangement with a foreign power or an Indian tribe, a mate- rial provision of which is unknown to one of the contracting parties, and is kept in the background to be used by the other only when the exigencies of a particular case may demand it. The proviso never appears to have been called to the atten- tion of the tribes, who would naturally assume that the treaty, embodied in the Presidential proclamation, contained all the terms of the arrangement. It is true that the proclamation recites that the Senate did, on March 25, 1840, resolve that the treaty, "together with the amendments, proposed by the Senate of the 11th of June, 1838, have been 'satisfactorily acceded to and approved of by said tribes," but, as the proc- lamation purported to set forth the treaty "word for word" as so amended, of course the amendments referred to were those embodied in the treaty as published in the proclama- tion.

The case of *Doe* v. *Braden*, 16 How. 635, relied upon by the Government in this connection, is not in point. In this case, in the ratification by the King of Spain of the treaty by which Florida was ceded to the United States, it was ad- mitted that certain grants of land in Florida were annulled

and declared to be void, and it was held that a written declaration, annexed to a treaty at the time of its ratification, was as obligatory as if the provision had been inserted in the body of the treaty itself. The question in the case was whether the king had power to annul the grant, which was considered a political and not a judicial question; but, as the annulling clause was inserted in the ratification and published in both countries as part of the treaty, there was no question whatever of concealment.

4. Assuming that the Indians took an immediate title to the lands reserved for them in Kansas, we are next to inquire whether such title has been legally forfeited. By the third article of the treaty it was further agreed "that such of the tribes of the New York Indians as do not accept and agree to remove to the country set apart for their new homes within five years or such other time as the President may from time to time appoint, shall forfeit all interest in the lands so set apart to the United States."

Acting in pursuance of the treaty and of the assumed right of forfeiture, the Government surveyed, and made part of the public domain, the lands at Green Bay ceded by the claimants and sold or otherwise disposed of, and conveyed the same and received the consideration therefor, except a reservation of about 65,000 acres to the Oneidas. The lands west of the Mississippi (the Kansas lands) were, after the treaty of Buffalo Creek, surveyed and made a part of the public domain, and sold or otherwise disposed of by the United States, which received the consideration therefor, and these lands were thereafter and now are included within the territorial limits of the State of Kansas.

In the view we have taken of the granting clauses of this treaty, the provisions of the third article created a condition subsequent, upon a breach of which the Government might declare a forfeiture, but had no power by simple executive action to reënter, take possession of the lands and sell them. A distinction is drawn by the authorities between the case of a private grantor, who may reënter in the case of the breach of a condition subsequent, and the Government, which can

only repossess itself of lands by legislative or judicial action. The distinction was first clearly drawn by this court in the case of *United States* v. *Repentigny*, 5 Wall. 211, 267, in which the court said : " We agree that before a forfeiture or reunion with the public domain could take place, a judicial inquiry should be instituted, or, in the technical language of the common law, office found, or its legal equivalent. A legislative act, directing the possession and appropriation of the land, is equivalent to office found. The mode of asserting or of assuming the forfeited grant is subject to the legislative authority ot the Government. It may be after judicial investigation, or by taking possession directly under the authority of the Government, without these preliminary proceedings." Practically the same language was used with reference to a grant of lands in aid of a railroad in *Schulenberg* v. *Harriman*, 21 Wall. 44, 63 ; in *Farnsworth* v. *Minnesota & Pacific Railroad*, 92 U. S. 49 ; and in *Van Wyck* v. *Knevals*, 106 U. S. 360. In *St. Louis, Iron Mountain &c. Railway Co.* v. *Magee*, 115 U. S. 469, it was said that " legislation to be sufficient " (for that purpose) " must manifest an intention by Congress to reassert title and resume possession. As it is to take the place of a suit by the United States to enforce a forfeiture, and a judgment therein establishing the right, it should be direct, positive and free from all doubt or ambiguity." See, also, *Pacific Railway Co.* v. *United States*, 124 U. S. 124. As there is no pretence that any such action as is contemplated by these cases was ever taken, it necessarily follows that, if an estate in fee simple vested in the Indians, the proceedings subsequently taken would not revest the title in the Government.

5. But even if it were conceded that the rights or the Indians were subject to forfeiture by executive action, it is by no means certain that the contingency ever happened which authorized such forfeiture ; or, if a forfeiture did result, it was not waived by the subsequent action of Congress. A condition, when relied upon to work a forfeiture, is construed with great strictness The grantor must stand on his legal rights, and any ambiguity in his deed or defect in the evi-

dence offered to show a breach will be taken most strongly against him, and in favor of the grantee. A condition will not be extended beyond its express terms by construction. The grantor must bring himself within these terms to entitle him to a forfeiture. Jones on Real Prop. §§ 678, 679.

It will be observed that the forfeiture is conditioned, not upon the actual removal of the Indians to the Kansas reservation, but upon their accepting and agreeing to removal within five years, or such other time as the President might from time to time appoint. The tribes for whom the Kansas lands were intended as a future home were the Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees and Brothertowns, residing in the State of New York.

Of these the Senecas and certain of the Cayugas and Onondagas residing among them expressly agreed in Article X " to remove from the State of New York to their new homes within five years, and to continue to reside there."

By Article XIII the Oneidas also agreed to remove as soon as they could make satisfactory arrangements for the purchase of their lands at Oneida.

By Article XIV the Tuscaroras also agreed to accept the country set apart for them, and to remove there within five years, and to continue to reside there.

In a supplemental treaty made with the St. Regis Indians on February 13, 1838, it was agreed that any of them who wished to do so should be at liberty to remove to Kansas at any time thereafter within the time specified in the treaty, but the Government should not compel them to remove.

It thus appears that, as to three of these tribes, there has been a technical performance so far as a forcible removal was concerned.

It further appears from the eleventh, twelfth and thirteenth findings that the President never fixed any time for their removal, as was contemplated in the third article ; that many of the Indians protested against any removal; that the Onondagas officially declared they would not remove ; that —

"After the amended treaty had been assented to, the Senecas, the Cayugas and the Onondagas residing with

them, and the Tuscaroras continued to protest against the treaty, the Senecas asserting that their declaration of assent was invalid, and that they would never emigrate but on compulsion, and requesting (as did also some Onondaga chiefs) that no appropriation be made to carry the treaty into effect. These protests were continued even after the treaty was ratified and until the treaty of May 20, 1842, was made. More than five years from the ratification of the treaty of Buffalo Creek the Tuscarora chiefs declared that the tribe would not part with its reservation nor remove from it, whatever a few individuals might do."

It further appeared that —

"No provision was made for the actual removal of more than about 260 individuals of the claimant tribes. Of this number only 32 ever received patents or certificates of allotment of the lands mentioned in the first article of the treaty, and the amount allotted to those 32 was at the rate of 320 acres each, or 10,240 acres in all.

"In 1845 Abram Hogeboom represented to the Government of the United States that a number of the New York Indians, parties to the treaty of 1838, desired to remove to the Kansas lands, and upon such representation, and in conformity with such desire, said Hogeboom was appointed special agent of the Government to remove the said Indians to Kansas.

"The sum of $9464.08 of an amount appropriated by Congress was expended in the removal of a party of New York Indians under Hogeboom's direction in 1846.

"From Hogeboom's muster-roll, in the Indian Office, it appears that 271 were mustered for emigration. The roll shows that of this number 73 did not leave New York with the party; 191 only arrived in Kansas, June 15, 1846; 17 other Indians arrived subsequently; 82 died and 94 returned to New York.

"It does not appear that any of the 32 Indians to whom allotments were made settled permanently in Kansas."

It is further found that —

"A council of the Senecas, the Cayugas and Onondagas living with them, and the Tuscaroras was called by the Indian

Commissioner, to be held at Cattaraugus, June 2, 1846, to learn the final wishes of the Indians as to emigration. The commissioner who was sent on the part of the United States reported that the meeting was well attended, but that the chiefs were unanimous in the opinion that scarcely any Indians who wished to emigrate remained."

In these findings lie the main strength of the defence.

It thus appears that a part had accepted and agreed to remove ; that a few had actually removed ; that others had stipulated that they should not be compelled to remove, and still others protested against the treaty and refused to remove. If the acceptance and signing of the treaty is not to be considered in itself as an acceptance and agreement to remove, as to which we express no opinion, there was a technical compliance with the conditions of Article III by a part of the Indians, and a flat refusal upon the part of others. But, after all, a mere agreement to accept and remove, though probably sufficient to prevent a legal forfeiture, was of no practical value, and would have availed the Government nothing, except as it might have justified a forcible removal had the Government elected to take that course. No provision was made as to the manner in which the removal was to be effected, but from the dependent character of the Indians, and from the appropriation of $400,000, made for that purpose, it is evident that it was contemplated that the removal should be made by the Government itself. It was so held by this court in *Fellows* v. *Blacksmith*, 19 How. 366, and we see no reason to question the propriety of that ruling. Whether the Government could have removed them forcibly was not decided in that case, and is not in this.

The difficult point in the case, in its equitable aspect, is whether the protests of the Indians and their final refusal to remove in 1846 do not estop them from claiming the benefit of the reservation made for them. This is the main defence in the case. Upon the other hand, no time was fixed by the President for their removal; no formal notice was ever given them to remove; but at various times, and particularly at the council held at Cattaraugus, June 2, 1846, called by the com-

missioners to learn the final wishes of the Indians as to emigration, the chiefs of the four tribes present were unanimous in the opinion that scarcely any Indians, who wished to emigrate, remained. This action constitutes practically the only claim of forfeiture. There is no finding that the other five tribes did refuse. The practical application which counsel seek to make of this partial refusal is to justify the Government, not only in appropriating the Kansas lands, but, inferentially, in failing to make any other compensation to the Indians for the seizure and sale of the Wisconsin lands. In view of this, it seems to us that, to justify a forfeiture, it should appear that the repudiation was as formal, as broad and as unequivocal as the acceptance; that the President should have fixed a time for the removal, and should at least have made a formal tender of performance. If it be said that, considering the number of the tribes and the character of the individuals he was dealing with, this was impracticable, it may also be said that the Government had undertaken to negotiate a treaty with them severally and collectively, and if it sought to enforce a forfeiture of rights originating in such treaty, it should have given formal notice to that effect, that the Indians might understand that they were risking the loss of all compensation for their Wisconsin lands by refusing to emigrate.

But however this may be, we think the fact that the Government never insisted upon this as an estoppel, and never treated the Indians as having lost their rights in the Kansas lands, is a sufficient answer to the claim of abandonment. After their refusal at the council in 1846, nothing appears to have been done until 1854, when Kansas had begun to feel the impress of a sudden and large immigration from the East, and an act (act of May 30, 1854, c. 59) known as the Kansas-Nebraska act was passed, creating the Territory of Kansas, in which Congress defined the limits of the new Territory, 10 Stat. 277, 284, and, after giving the boundary lines, which included the New York Indian lands —

" *Provided,* That nothing in this act contained shall be construed to impair the rights of person or property now

pertaining to the Indians in said Territory so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any Territory, *which by treaty with any Indian tribe*, is not, without the consent of said tribes, to be included within the territorial limits or jurisdiction of any State or Territory; but all such territory shall be excepted out of the boundaries and constitute no part of the Territory of Kansas until said tribes shall signify their assent to the President of the United States to be included within the said Territory of Kansas."

The thirty-seventh section of the same act (p. 290) provides —

"That all treaties, laws and other engagements made by the Government of the United States with the Indian tribes inhabiting the Territories embraced within this act shall be faithfully and rigidly observed, notwithstanding anything contained in this act."

Even if the first clause of this proviso be limited to the Indians, then "in said Territory," of whom only thirty-two were New York Indians, the second clause is subject to no such limitation, and applies to treaties "with any Indian tribe." The reference here is evidently to the treaty of Buffalo Creek, and is a distinct recognition of the subsisting validity of such treaty, and a promise on the part of Congress that it shall be faithfully and rigidly observed, "notwithstanding anything contained in this act," and we may add, notwithstanding the refusal of the Indians to emigrate and the now claimed forfeiture of their rights.

Some steps were taken to effect a settlement with the Indians, and on November 5, 1857, a treaty was entered into with the Tonawandas in which, after reciting the treaty of 1838, the surrender of 500,000 acres of lands in Wisconsin, the agreement to set apart the lands in Kansas, the Tonawandas relinquished their interest in the Kansas lands, the United States agreeing to pay them therefor the sum of $256,000. 11 Stat. 735. But the Tonawandas were but one of the nine tribes which participated in the treaty, and there seems to have been no reason why their claim should have

been recognized in preference to others who stood upon the same footing. Upon the theory of the Government, there was no reason why this treaty should have been entered into at all. It was clearly a recognition of the fact that the Tonawandas had rights which, in the nineteen years which had elapsed since the treaty was made, they had not forfeited.

But this is not all: In the eleventh section of the sundry civil appropriation act of March 3, 1859, c. 82, 11 Stat. 425, a provision was made for the issue of patents to Indians who were entitled to separate selection of lands in Kansas, with a proviso that "nothing herein contained shall be construed to apply to the New York Indians, or to affect their rights under the treaty made with them in 1838 at Buffalo Creek." If this was not a recognition of the fact that the Indians still had rights, it certainly shows that their alleged rights had been made the subject of consideration, and were not repudiated or denied.

But it seems that the matter did not rest here, for in the same month in which the last above act was passed, namely, March 21, 1859, the Secretary of the Interior directed the New York Indian reservation in Kansas to be surveyed, with a view of allotting a half section each to such of the New York Indians as had removed there under the treaty, after which the residue was to become public domain, and in December, 1860, the President proclaimed the reservation to be a part of the public domain.

Notwithstanding this, however, in the act of January 29, 1861, c. 20, 12 Stat. 126, admitting Kansas to the Union as a State, it was provided that nothing should be so construed as to impair the rights of person or property pertaining to the Indians in said Territory so long as such rights should remain unextinguished by treaty. It may be said that the provisos in this act applied only to the Indians in said Territory, but even if it be so limited, the provision in the act of March 3, 1859, clearly applies only to the New York Indians, whose rights under the treaty were recognized. Up to the time these acts were passed certainly there had been no denial of the right of the Indians to these lands, and no action on the

part of the Government indicating an intent to insist upon the forfeiture of such right. Every legislative expression tended toward an acknowledgment of the fact that their claim was unimpaired.

Our attention has also been called to certain documents emanating from the executive and legislative departments of the Government, some of which tend to strengthen the idea that these departments never intended to treat the action of the Indians as a forfeiture of their grant, and acquiesced in the justice of the claims the Indians now make, and have already made under the treaty of Buffalo Creek. It is insisted by the Attorney General that, as these documents are not referred to in the findings of fact by the court below, this court cannot consider them; but as they are documents of which we may take judicial notice, we think the fact that they are not incorporated in the findings of the court will not preclude us from examining them, with a view of inquiring whether they have the bearing claimed. *Jones* v. *United States*, 137 U. S. 202, 214.

While it is ordinarily true that this court takes notice of only such facts as are found by the court below, it may take notice of matters of common observation, of statutes, records or public documents, which were not called to its attention, or other similar matters of judicial cognizance.

As indicating the views of the executive in regard to the justice of the Indians' claims, a treaty was concluded September 2, 1863, with the New York Indians who had moved to Kansas under the treaty of 1838, for the purpose of extinguishing their title to lands in that State. This treaty was based on the treaty of November 5, 1857, with the Tonawandas, and was sent to the Senate for ratification, but action was suspended upon it "until a treaty could be concluded with all the New York Indians to arrange all matters between them and the United States which required adjustment." Ex. Doc. Y, p. 2, 40th Cong. 3d sess.

In pursuance of this policy, the President, in May, 1864, directed a commissioner to proceed to the State of New York for the purpose of negotiating a treaty with the New York

Indians. These Indians had been previously notified on April 26, 1864, by the Secretary of the Interior that he deemed it proper to advise them, through their agent, " that it is the desire of the Government to extinguish their title to a tract of land in Kansas, ceded to them by the treaty of January 15, 1838;" and that a treaty had already been made for that purpose with the fragments of bands of these Indians residing in Kansas. Ex. Doc. No. 1, 38th Cong. 2d sess. p. 188.

The treaty with the Indians living in New York was not concluded, but in his annual report to Congress the Secretary of the Interior on December 6, 1864, spoke of the efforts to extinguish the title of these Indians to the Kansas lands, and considered their claims as " being undeniable and just." *Ibid.*

This opinion was reiterated by the Commissioner of Indian Affairs on December 5, 1866, in his annual report. (p. 61.)

In November, 1868, the President again attempted to negotiate a treaty or treaties with the Senecas and other New York Indians with reference to " their claims arising under the treaties of 1838 and 1842." Ex. Doc. Y, p. 10, 40th Cong. 3d sess. And thereafter a treaty was concluded December 4, 1868, according to the instructions issued to the commissioner appointed to negotiate it, by which the United States agreed to pay the sum of $320 to each Indian, including half-breeds, of the Six Nations in New York and Wisconsin. *Ibid.* p. 1.

The commissioner appointed to negotiate this treaty reported to the Indians in council that " the reason why the New York Indians had not been removed to their Kansas reservation was because squatters had obtained possession of their lands, and the United States was unable to drive them off, and keep them off." *Ibid.* p. 10.

This treaty, however, was not ratified by Congress, owing presumably to the passage of a general law which denied the right of any Indian tribe or nation to be recognized as an independent nation for treaty-making purposes. Act of March 3, 1871, c. 120, 16 Stat. 544, 566.

In a communication dated January 29, 1884, addressed to

the Secretary of the Interior for transmission to the Senate, the Commissioner of Indian Affairs reviewed the claims of the New York Indians under the treaty of 1838, and adhered to the opinions of his predecessors, in that there was a failure on the part of the Government to provide homes for those who went to Kansas, and that no consideration had been given the New York Indians for the cession of the 500,000 acres of Wisconsin lands. He referred to the settlement with the Tonawandas, and stated that he saw "no reason why the other tribes should not receive the same relief."

While none of these documents are of great importance in themselves, they serve to indicate very clearly that in the mind of the Executive and departmental officers the rights of the Indians, under the treaty of Buffalo Creek, were continuously recognized as just claims against the Government.

We are at a loss to understand upon what theory this can be considered an abandoned claim. If the evidence pointed in that direction the argument would come with better grace if the Government had not itself received the full consideration stipulated by the treaty (so far as such consideration was a valuable one) for the Kansas lands, and had neglected to render any account of the same. Of course, if the legal title passed to these Indians, something else than a failure to assert such title is necessary to divest it. But however this may be, the court finds (finding 17) that after the order of the Secretary of the Interior of 1859, and before the proclamation of the President of said lands as part of the public domain in December, 1860, "some of the New York Indians employed counsel to protect and prosecute their claims in the premises, asserting, in the powers of attorney, that the United States had seized upon the said lands contrary to the obligations of said treaty, and would not permit the said Indians to occupy the same or make any disposition thereof. The said Indians have since asserted their said claims." How long, or how frequently, or in what manner the Indians continued to assert their claims, does not appear; but it seems that on June 21, 1884, their claims, together with the vouchers, papers, proofs and documents appertaining thereto, were referred to the

Court of Claims for an investigation and finding of facts. To create an abandonment there must not only be an omission to prosecute, but an intent to forego, of which there is no evidence in this case. Indeed, it is not altogether clear that the Government did not waive this point in the act of 1893, conferring jurisdiction upon the Court of Claims to enter judgment, when it declared that the statute of limitations should not be pleaded as a bar to recovery.

The appropriation of these lands by the Government is probably explicable by the fact that an enormous emigration to Kansas was at that time in progress for the avowed purpose of preventing the establishment of slavery in the Territory ; that the pressure of population for land was very great ; that the Territory was almost in the throes of civil war; that the negotiation of a new treaty with nine different tribes would be attended with considerable delay ; that but few of the Indians had actually removed and resided in Kansas, and that the Secretary of the Interior assumed, what undoubtedly the facts had some tendency to show, that the grant had lapsed by the failure of the Indians to emigrate, and therefore considered himself fully justified in taking possession of the lands, and settling with the Indians in a future treaty. The claim of the Tonawandas was actually settled. Congress, in the act of 1861 admitting Kansas, provided for the subsequent extinguishment of Indian titles ; but a great civil war then intervened, and for several years absorbed the attention of Congress, and the matter does not seem to have been resuscitated until after the lapse of about twenty years, when Congress referred the case to the Court of Claims, with an express waiver of the statute of limitations. We do not perceive in all this an intention on the part of the Indians to abandon their claims, or any indication on the part of Congress that it considered it abandoned.

6. But little need be said considering the cash payments to be made under the ninth, twelfth, thirteenth and fourteenth articles of this treaty. Most, if not all, of these payments were to be made upon the actual removal of these Indians to the West, and as this contingency never happened, the

Syllabus.

.amounts never became due.   The same ruling applies to the appropriation of $400,000 in the fifteenth article, which was made to aid in removing the Indians to their new homes, supporting them the first year after their removal, and for other incidental purposes contingent upon their removal.

*The judgment of the Court of Claims is therefore reversed, and the case remanded with instructions to enter a new judgment for the net amount actually received by the Government for the Kansas lands, without interest, less the amount of lands upon the basis of which settlement was made with the Tonawandas, and other just deductions, and for such other proceedings as may be necessary, and in conformity with this opinion.*

The CHIEF JUSTICE, MR. JUSTICE HARLAN and MR. JUSTICE BREWER dissented.