William & Anna SWIFT and David & Ellen Dahl, Rockne & Sandra Wilson, and David & Carol Slater, Appellants,

v.

Darrell & Marjorie KNIFFEN, Fairhill, Inc., and Lot 14, Block 2 of a portion of the Southwest Quarter of Section 36, Township 1 North, Range 1 West, Fairhill Subdivision, Fourth Judicial District, State of Alaska, Appellees.

No. S–364.

Supreme Court of Alaska.

Sept. 13, 1985.

Rehearing Denied Oct. 9, 1985.

---

Charles D. Silvey, Schaible, Staley, DeLisio & Cook, Fairbanks, for appellants.

Patrick T. Brown, Rice, Hoppner, Brown & Brunner, Fairbanks, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

BURKE, Justice.

## OPINION

Appellants own property in a Fairbanks subdivision and filed suit against the subdivider (appellee) to obtain an easement to a disputed roadway in the subdivision. Four theories were presented at trial: common law dedication, private roadway easement (estoppel), easement by prescription and easement by necessity. After the superior court ruled against them on all four theories, appellants appealed on the first three theories and on the court's denial of their motion for a new trial. In addition, three attorney's fees claims are raised.

We affirm the superior court's judgment on the theories of common law dedication and private roadway easement, but reverse and remand the case for additional factual findings on the Swifts' entitlement to an easement by prescription. On remand, the appellants may ask leave of the trial court to amend their pleadings to allege the creation of a public easement by prescription. Since the final judgment is reversed and remanded we vacate the attorney's fees awards. To avoid the appearance of impropriety, we order that a new judge be assigned to make the findings on remand.

## I. BACKGROUND

In 1968 Marjorie and Darrell Kniffen purchased a tract of undeveloped land near Fairbanks. The Kniffens held the land until it was subdivided. Ownership was then transferred to Fairhill, Inc., (Fairhill) a de-velopment corporation controlled by the Kniffens. Fairhill immediately began to develop the parcel by building roadways.

A number of preliminary plats were submitted to the North Star Borough Planning and Zoning Commission. The Borough rejected one plat, which reflected the disputed roadway as the main access to the subdivision, because the road was not compatible with grade requirements. Consequently, in another plat Fairhill dedicated Fairhill Road, approximately 900 feet north of the disputed road, as access to the subdivision.

The disputed roadway was partially built at the time the Borough rejected it as an access road. The uphill section, between Gruening Way and Peters Road, was subsequently reseeded and is not part of this dispute. At issue here is the downhill portion, between City Lights Boulevard and Gruening Way, which already had tailings on it and could not be reseeded. Fairhill left the road as a driveway to two undeveloped lots and continued to pay taxes on it.

The Kniffens, the subdivision's first residents, moved to Peters Road in 1971. The subdivision's second residents, Bill and Anna Swift, purchased Lots 26 and 27 and began clearing them in early August 1971. They began constructing their home in the spring of 1972 and moved into it in the spring of 1973. David and Ellen Dahl first came to Fairhill in 1973 or 1974 and used the roadway frequently. They purchased Lot 2 in 1981. A number of other people have purchased lots since Fairhill began selling them in 1969.

Many of the subdivision's residents used the disputed roadway daily or a few times each week, especially when Fairhill Road was impassable. Use increased as more people purchased lots and built homes in the subdivision. Mr. Swift recalled first driving on the roadway in 1969. From the time the Swifts bought their lot in 1971 to the time they moved into their new home in 1973, they claim to have used the roadway anywhere from several times a day to several times a week. Once they were living in the subdivision they claim to have used

the roadway often. The general public used the roadway periodically as an access road to visit subdivision residents and for recreational vehicle use. Marjorie Kniffen testified that she and her husband used the road once in awhile.

The residents who testified maintained that Fairhill did nothing to suggest to them that the disputed road was not public until 1981. No resident claimed that the Kniffens or any other agent of Fairhill told them that they could use the roadway, but most testified that they had never been told they could not use it. They claim that while other private areas of the subdivision were posted against trespassing, the disputed road never was. They claim that while the Kniffens confronted trespassers on other private areas of the subdivision, the Kniffens never reprimanded people for using the road.

Marjorie Kniffen testified that she stopped trespassers on the road, although she admits she never stopped the Dahls or Swifts. She claims to have posted the road repeatedly against trespassing before 1972, but ceased posting because no property was being damaged and the signs were always ripped up quickly anyway. No residents recalled seeing these postings; however, none except the Swifts lived in the subdivision during those years. In 1972, when use of the road and the surrounding area resulted in property damage, Marjorie Kniffen ran an ad for three months in the local newspaper announcing that snowmachines, motorcycles and cross country vehicles were prohibited in the area and warning the public against future trespassing on the road and in the vicinity. Appellants contend that this ad gave no notice that Fairhill sought to prevent normal vehicular use of the disputed roadway. Marjorie Kniffen also claimed to have blocked the road with snow berms, but none of the witnesses recalled her having done this.

Marjorie Kniffen acknowledged that she was aware that people were using the road

in the early 1970s, but she did not believe they were subdivision residents. She claims she never saw the Swifts use the road and had no reason to believe they used it regularly before they moved into the subdivision in 1973. However, she admitted that by 1974 she thought the Swifts were using the road and that Mr. Swift had plowed it.

In 1981 several residents informed Marjorie Kniffen that they were pooling their resources to upgrade the subdivision roads and that they planned to grade the disputed road. Marjorie Kniffen objected, claiming it was private property. Fairhill physically blocked the road in October 1981.

Residents of the subdivision, the Wilsons, Slaters, Dahls, and Swifts, filed a complaint in May 1982 against Mr. and Mrs. Kniffen and Fairhill,[1] seeking an easement to the disputed road. Fairhill's answer raised a trespass counterclaim. In December 1982, the Wilsons and Slaters obtained an order dismissing their complaint without prejudice. The counterclaim against them was eventually dismissed in December 1983, just days before the trial commenced.

At trial, the Swifts and Dahls sought judicial recognition of an easement to use the disputed roadway, for the public at large, the subdivision owners, or for the Swifts only under four legal theories. The court ruled for Fairhill on the four easement theories and the trespass counterclaim; however, no damages were awarded for the counterclaim. On appeal, appellants have abandoned their claim to an easement by necessity, but challenge the superior court's rejection of the other three theories.

## II. COMMON LAW DEDICATION

■ A common law dedication occurs "when the owner of an interest in land transfers to the public a privilege of use of such interest for a public purpose." *Ham-*

---

1. The plaintiffs decided Fairhill was the proper defendant and dropped the complaints against the Kniffens. Plaintiffs added Mr. William Av-

ersa, the purchaser of lot 14 which contains the disputed road. Pursuant to a stipulation, the court ordered that Aversa was no longer a party.

*erly v. Denton,* 359 P.2d 121 (Alaska 1961); *see also State v. Fairbanks Lodge No. 1392, Loyal Order of Moose,* 633 P.2d 1378 (Alaska 1981); *Olson v. McRae,* 389 P.2d 576 (Alaska 1964). There are two essential elements of a common law dedication: (1) an owner's offer of dedication to the public and (2) acceptance by the public.[2] 6A R. Powell & P. Rohan, *The Law of Real Property* ¶ 926[1] (1980). The crux of the offer requirement is that the owner must somehow objectively manifest his *intent* to set aside property for the public's use. The existence of an intent to dedicate is a factual issue which the claimant must clearly prove. "Passive permission by a landowner is not in itself evidence of intent to dedicate. Intention must be clearly and unequivocally manifested by acts that are decisive in character." *Hamerly,* 359 P.2d at 125 (footnotes omitted); 6A R. Powell & P. Rohan, *supra,* ¶ 926[2]. The appellants present three arguments for the existence of an implied dedication.

■ First, the Swifts and Dahls claim that an intent to dedicate can be inferred from the preliminary plat which included the roadway. While the final plat does not show the disputed roadway, appellants maintain that Fairhill's failure to withdraw its proposed dedication by words or conduct means that the offer is outstanding. We disagree. In some circumstances a recorded plat may evidence intent to dedicate property for public use. 6A R. Powell & P. Rohan, *supra,* ¶ 926[2], at 84–89–90. However, even assuming an intent to dedicate can be established from the filing of the preliminary plat, the superior court found that after the plat was rejected, Fairhill engaged in "sufficient activities to negate any presumed intent to dedicate to the public." The court's finding on this factual issue is not clearly erroneous. *See* Alaska Civil Rule 52(a) (a trial court's findings of fact shall not be set aside unless clearly erroneous).

■ The Swifts and Dahls also contend that because Fairhill allegedly acquiesced to public use from the time the disputed road was built in 1969 until 1981, an intent to dedicate should be implied. As noted above, a landowner's acquiescence is not sufficient to show an intent to dedicate; rather, evidence of affirmative acts must be produced. *Hamerly,* 359 P.2d at 125.[3]

Finally, the Swifts and Dahls argue that the estoppel theory establishes an implied intent to dedicate. They claim that Fairhill built the disputed roadway and left it in such condition that it looked like every other true road in the subdivision. They contend, therefore, that the public detrimentally relied on the reasonable belief that it would be able to utilize the roadway.

■ In a proper case, estoppel may be the basis for finding an implied intent to dedicate property for a public use.[4] Under Alaska law, a private easement is created by estoppel only upon a showing of an oral grant and detrimental reliance. *See* discussion *infra* section III. The requirements for a public offer of dedication by estoppel are the same as those for a private easement, except that claimants must show detrimental reliance by the public at large to establish an intent to dedicate for public use. In this case, Fairhill made no oral grant of a public easement. Moreover, there is no evidence that individual members of the public, or the local government itself, detrimentally relied on the road's

---

**2.** The superior court held that the Kniffens did not "dedicate" the disputed road to the public, because neither the intent to dedicate nor public use was present. We affirm the superior court's rejection of the dedication theory, on the ground that there was no intent to dedicate the roadway for public use. Consequently, we need not reach the question of acceptance by public use.

**3.** Conversely, some jurisdictions imply an intent to dedicate land from an owner's acquiescence

to public use. *Flake v. Thompson,* 249 Ark. 713, 460 S.W.2d 789, 794 (1970); *Gion v. City of Santa Cruz,* 2 Cal.3d 29, 84 Cal.Rptr. 162, 465 P.2d 50 (1970).

**4.** Other courts have found implied intent to dedicate by estoppel. *Diamond Match Co. v. Savercool,* 218 Cal. 665, 24 P.2d 783 (1933); *Bailey v. Thompson,* 300 S.W.2d 235 (Ky.App.1957); *Henry v. Ionic Petroleum,* 391 P.2d 792 (Okla.1964).

dedication. *See* discussion *infra* section III. Consequently, dedication by estoppel must be rejected.

### III. PRIVATE EASEMENT BY ESTOPPEL

■ The Swifts and Dahls claim the right to a private roadway easement for the Fairhill Subdivision residents on the basis of estoppel.[5] Estoppel has been accepted in Alaska as a theory for the establishment of a private easement. *Hawkins v. Alaska Freight Lines,* 410 P.2d 992, 993 (Alaska 1966); *Freightways Terminal v. Industrial and Commercial Construction,* 381 P.2d 977, 983 (Alaska 1963). We have made it clear, however, that a party "may not rely upon the theory of creation of an easement by oral grant and estoppel, when there is no evidence to support a finding that an oral grant was made." *Hawkins,* 410 P.2d at 993 (footnote omitted). *See Freightways Terminal,* 381 P.2d at 984; 3 H. Tiffany & B. Jones, *Real Property* § 801, at 317–18 (3d ed. 1939).

■ In the instant case, there are no allegations that Fairhill made an oral grant of easement to use the disputed roadway. Furthermore, the record does not support the contention that the subdivision residents relied on their belief that the roadway was public. Caleb Pomeroy is the only witness who testified that he would not have bought his lot in the subdivision had he known that the roadway was not public. Other witnesses, including appellants, proclaimed only failed expectations, but not reliance.[6] We hold that the superior court properly rejected the creation of a private easement for the subdivision residents by estoppel, due to the lack of both an oral grant and detrimental reliance.

### IV. PRESCRIPTIVE EASEMENT

■ The Swifts, but not the Dahls, claim to have established a private prescriptive

easement over the disputed roadway. To establish a claim for prescriptive easement, a claimant must show essentially the same elements as for adverse possession. *Dillingham Commercial Co. v. City of Dillingham,* 705 P.2d 410, 417 (Alaska 1985). We discussed the three basic requirements for adverse possession in *Alaska National Bank v. Linck,* 559 P.2d 1049, 1052 (Alaska 1977): "(1) the possession must have been continuous and uninterrupted; (2) the possessor must have acted as if he were the owner and not merely one acting with the permission of the owner; and (3) the possession must have been reasonably visible to the record owner." *See also Bentley Family Trust v. Lynx Enterprises,* 658 P.2d 761, 765 (Alaska 1983). The main purpose of these requirements is to put the record owner on notice of the existence of an adverse claimant. *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826, 830 (Alaska 1974). To prevail, the claimant must prove each element by clear and convincing evidence. *Bentley Family Trust,* 658 P.2d at 765 n. 10 (citing *Curran v. Mount,* 657 P.2d 389, 391 (Alaska 1982)).

Because the disputed roadway was physically blocked in the fall of 1981, the superior court correctly determined that the Swifts must show adverse use between the fall of 1971 and the fall of 1981, in order to satisfy the ten-year statutory time requirement. AS 09.10.030. The superior court made the following factual findings regarding use of the property during this time period:

During the fall of 1971, Fairhill Subdivision was basically uninhabited land. The Swifts were the first to build in the subdivision. They purchased lots 26 and 27 in early 1971 and commenced clearing at least in August of 1971. Actual house construction began in the spring of 1972 and they occupied their house in 1973.

---

**5.** Both the appellee and superior court thought the theory argued was one of private dedication and rejected the theory on that ground.

**6.** Many of the subdivision residents claimed that the disputed road looked just like the other subdivision roads and that from the time they purchased their property until 1981 they believed that the disputed road was a public roadway.

At best, plaintiffs' testimony shows only sporadic use of the roadway in question from August of 1971 until the spring of 1972.[7] The testimony of Mr. and Mrs. Swift, Kim Kniffen and Marjorie Kniffen establishes that the road was often closed and unplowed for long periods of time during some winters between 1971 and 1981.

The superior court rejected the Swifts' claim because "[s]uch periodic use is insufficient to show, by clear and convincing evidence, that the use by the plaintiffs was either continuous or sufficiently notorious to give the required notice to defendant to establish a prescriptive easement."

 We find the superior court's factual findings on the issue of private prescriptive easement inadequate for purposes of our review. We remand the case for factual findings on all three elements of prescriptive easement, so that we may have a clear understanding of the basis of the superior court's decision. *See Uchitel v. Telephone Co.*, 646 P.2d 229, 236 n. 16 (Alaska 1982); *Wigger v. Olson*, 533 P.2d 6, 7–8 (Alaska 1975).

A. *Continuity*

The key Alaska case defining the continuity requirement in the context of adverse possession is *Alaska National Bank v. Linck*, 559 P.2d 1049, 1052 (Alaska 1977). In *Linck* we stated:

> The nature of possession sufficient to meet this requirement depends on the character of the property. One test is whether the adverse possessor has used and enjoyed the land as "an average owner of similar property would use and enjoy it."
>
> *An interruption of possession caused by the record owner or third parties*, or abandonment by the possessor, tolls the running of the statute of limitations.

*Id.* at 1052 (emphasis added) (citations omitted).

 The superior court appears to have misapplied the test for continuity. The fact that the road was sometimes unplowed and impassable for weeks at a time does not signify either abandonment or interrupted use. First, to establish abandonment the period of non-use must indicate that the adverse user had ceased his use and claim. Failure to plow and use a road for a few weeks in winter in Fairbanks does not demonstrate that the Swifts no longer intended to use the road as an alternative route to their property. Second, interruption of possession or use must be caused by the record owner or third parties. *Id.* The Swifts' use of the roadway was not interrupted until the fall of 1981, when the Kniffens physically blocked the roadway. Prior to that time, the Kniffens apparently posted signs warning against trespassing and ran an advertisement. These acts, however, were not sufficient by themselves to interrupt the Swifts' adverse use.[8] The roadway's closure due to snowfall cannot be considered an interruption because it was not caused by the Kniffens or Fairhill.[9]

B. *Hostility*

 In *Linck*, we interpreted hostility as requiring the adverse possessor to show that he acted as if he were the owner and not merely one acting with the owner's permission. 559 P.2d at 1053. In the easement context, the user must have acted as if he were claiming a permanent right to the easement. *City of Anchorage v. Nesbett*, 530 P.2d 1324, 1331 (Alaska 1975).

 The sort of permission which would negate the claim of an adverse user is not mere acquiescence because:

**7.** The superior court actually referred to the years "1981 until the spring of 1982," however, we assume the court intended to refer to the relevant period in the 1970s.

**8.** If anything, the Kniffens' acts merely add support to the Swifts' claim that their use was

hostile, an issue that is discussed in the following section of this opinion.

**9.** We do not hold that the continuity requirement has been met. On remand, other factual findings might indicate that the Swifts' use of the roadway was not continuous.

[T]he whole doctrine of title by adverse possession rests upon the acquiescence of the owner in the hostile acts and claims of the person in possession.

*Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d at 833; 4 H. Tiffany, *supra,* § 1196, at 984 (3d ed. 1975); 2 G. Thompson, & J. Grimes, *Commentaries on the Modern Law of Real Property,* § 341, at 203 (1980). In the context of adverse possession we have consistently held:

When one assumes possession of another's property, there is a presumption that he does so with the rightful owner's permission and in subordination to his title. "This presumption is overcome only by showing that such use of another's land was not only continuous and uninterrupted, but was openly adverse to the owner's interest, i.e., by proof of a distinct and positive assertion of a right hostile to the owner of the property."

*Ayers v. Day and Night Fuel Co.,* 451 P.2d 579, 581 (Alaska 1969) (quoting *Hamerly,* 359 P.2d at 126); *Peters,* 519 P.2d at 833. This presumption has been applied to easement disputes as well. *Dillingham,* 705 P.2d at 415 (Alaska 1985); *Nesbett,* 530 P.2d at 1330 n. 16.

■ In rejecting the Swifts' claim for prescriptive easement, the trial court made no findings of fact or conclusions of law regarding the hostility requirement. The hostility element turns on the distinction between acquiescence and permission. On remand the trial court must determine if Fairhill intended to permit use of the roadway or whether the Swifts' use was the result of Fairhill's acquiescence. If the latter is found, then the Swifts' use of the roadway was adverse and hostile.

### C. *Notoriety*

■ In *Linck* we held that in order to satisfy the notoriety requirement, the adverse possessor (here the adverse user) need not show that the record owner had actual knowledge of the adverse party's presence. Rather, the owner is charged with knowing what a duly alert owner would have known. 559 P.2d at 1053; *see*

*also Shilts v. Young,* 567 P.2d 769, 776 (Alaska 1977). What a duly alert owner is expected to know depends on the nature of the property:

[A]s with the other elements of adverse possession, to determine what constitutes sufficient notoriety we must consider the character of the land. We cannot expect the possessor of uninhabited and forested land to do what the possessor of urban residential land would do before we charge the record owner with notice.

*Linck,* 559 P.2d at 1053.

The Swifts claim that they used the disputed roadway regularly since 1969, and that Fairhill was aware that members of the public sporadically used the road even at that time. The Swifts' use, however, must be notorious in its own right, and not dependent on a similar right in others. *See Nordin v. Kuno,* 287 N.W.2d 923, 926 (Minn.1980). When a claimant's use is in common with the public's use, the claimant must perform some act with the owner's knowledge clearly indicating his own individual claim of right. *Saunders Point Association v. Cannon,* 177 Conn. 413, 418 A.2d 70, 73 (1979); 2 G. Thompson & J. Grimes, *supra,* § 341, at 203.

The superior court concluded that the Swifts' use had not been notorious, but made no factual findings on the issue. A remand is necessary to determine if a duly alert owner would have known that the Swifts were regularly using the roadway, at least since 1971.

■ One further aspect of the prescriptive easement issue deserves our attention. The Swifts are the only parties who claim to have established a private prescriptive easement over the disputed roadway, however, a number of other Fairhill residents and members of the public appear to have also adversely used it. In an attempt to gain a public easement, appellants argue the theory of implied dedication. They are unsuccessful on this theory because Fairhill made no offer of dedication. *See supra* section II. This, however, does not end the inquiry. A closely related theory

remains a viable alternative. In a recent decision, *Dillingham Commercial Co. v. City of Dillingham*, 705 P.2d 415, we explicitly held that a public easement may be acquired by prescription.[10] The rule in *Dillingham* was announced while this appeal was pending, long after appellants filed their initial complaints and submitted their appellate briefs. On remand, appellants may ask leave of the trial court to amend their pleadings to include a claim to a public easement by prescription.[11] The trial court may entertain such a motion, applying the rules that govern the amendment of pleadings.

## V. JUDGE ON REMAND

In their reply brief, appellants present newly obtained evidence which they claim is ground for a new trial under a different judge. At trial, Judge Blair disclosed that ten or eleven years previously, while in private practice, he represented the Kniffens in litigation involving trespass in the Fairhill subdivision. Appellants claim that in July 1984, after their primary appellate brief was filed, they were advised that Judge Blair was the primary attorney in the earlier case and that one of the issues was common law dedication of a roadway in Fairhill subdivision. Appellants do not allege intentional wrongdoing, only the appearance of impropriety.

■ We have the utmost confidence in Judge Blair's ability to remain impartial despite his previous involvement with the Kniffens over ten years ago in a similar suit.[12] The appearance of impropriety, however, compels us to order the assignment of another judge on remand.[13]

## VI. ATTORNEY'S FEES

The Wilsons, Slaters, Swifts and Dahls commenced this litigation by filing a complaint on May 7, 1982. After an answer, counterclaim and reply were filed, the Wilsons and Slaters obtained a voluntary dismissal of their complaint, pursuant to Alaska Civil Rule 41(a)(2). Approximately ten months later and four days before the trial began, appellees voluntarily dismissed their counterclaim against the Wilsons and Slaters.

After a memorandum opinion was entered in favor of appellees on all counts, appellees moved for attorney's fees against the Wilsons and Slaters for fees incurred litigating their complaint before it was dismissed. The Wilsons and Slaters moved for attorney's fees against appellees because of the counterclaim dismissal.[14] The trial court ordered the Wilsons and Slaters to pay appellees $200 in attorney's fees. Appellees also obtained $4403.95 in attorney's fees against the Swifts and Dahls.

■ Since we have concluded that the judgment in favor of appellees must be reversed and the case remanded, the superior court's order granting $200 in attorney's fees against the Wilsons and Slaters

---

**10.** While implied dedication and prescriptive easement are both theories commonly used to establish the public's right to use land as a public highway, there are important distinctions between the two. Implied dedication cannot be established through an owner's acquiescence to the public's use of his land. A manifest intent to dedicate is required. *Hamerly*, 359 P.2d at 125. Prescription, however, is created not when the land is used with the owner's permission, but instead when he acquiesces to the public's use for the statutory time period. *Peters*, 519 P.2d at 833.

**11.** Amendment to the pleadings may be proper on remand. *See City of Columbia v. Paul N. Howard Co.*, 707 F.2d 338, 341 (8th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983) (interpreting Fed.R.Civ.P.

15(a)); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1489, at 449–50 (1971); 3 J. Moore, Moore's Federal Practice ¶ 15.11, at 15–150 (1984).

**12.** Disqualification is required if either party has retained the judge as their attorney in any matter within two years preceding the filing of the action. AS 22.20.020(a)(5).

**13.** Due process requires the appearance as well as the fact of impartiality. *State v. Lundgren Pacific Constr.*, 603 P.2d 889, 895–96 (Alaska 1979).

**14.** We find no order denying their motion in the record; however, we presume it was denied since the court ordered the Wilsons and Slaters to pay fees to appellees.

and $4403.95 against the Swifts and Dahls must be vacated. After final judgment is reached on remand, the superior court can redetermine the prevailing party or parties under Civil Rule 82, and award attorney's fees accordingly. *Curtiss v. Hubbard,* 703 P.2d 1154, 1154 (Alaska 1985).

The superior court's judgment is REVERSED and the case is REMANDED for adequate findings of fact and conclusions of law consistent with this opinion.