WINFREE, Justice,
with whom STOWERS, Justice, joins, dissenting.
In my view the trial court correctly applied our existing case law, made findings of fact not clearly erroneous, and did not err by ultimately deciding that Edward Shaw had a perfected prescriptive easement across the property owned by James Dault and Shala Dobson (Dault) in the North Shore Subdivision.
*96 The fundamental issue in this case is whether clear and convincing evidence demonstrates that Shaw and his predecessors’ use of the trail across Dault and his predecessors’ property was sufficiently “hostile” to support perfection of a prescriptive easement, i.e., whether Lot 28’s series of owners acquiesced to, but did not permit, use of the trail across the lot. The trial court found such clear and convincing evidence, first by employing a presumption of hostility based on McDonald v. Harris,[1] and alternatively by ignoring that presumption and using the normal hostility standard.[2]
The court today holds that the trial court erred in finding that the hostility requirement was met under either approach because:
Here it was undisputed that the trail was established by the subdivision developers for their own use in marketing the lots and that the developers allowed lot buyers to use the trail for an indeterminate period. It would not make sense to presume that the use of a trail as intended by those who owned the land and built the trail was anything other than consensual.[3]
But if all that this statement implies really were undisputed, the case would not have survived summary judgment. Acting as its own fact-finder, the court reaches a view of the record not shared by the parties or the trial court — that it is undisputed that the realtor-developers were among Dault’s predecessors in title to Lot 28.
According to the 1966 recorded plat, the original owner and subdivider of the property resulting in the North Shore Subdivision was Helen P. Clements. The court acknowledges that Clements recorded the subdivision plat, and then states that “other evidence established” that John and Ina Boss and Louis and Mary Odsather were the subdivision developers.[4] I have no quarrel with this latter assertion — evidence in the record demonstrates that the Bosses and Odsathers were connected to a realty company and they purchased subdivision lots from Clements as a development project; they rightfully are described as the subdivision developers, but they were not the original subdivider. This is an important distinction when considering who was in the chain of title to Dault’s Lot 28. As the original subdivider, Clements clearly was in that chain of title. But the realtor-developers were in that chain of title only if they actually acquired Lot 28 and then conveyed it to a Dault predeeessor-in-title, and not merely because the court labels them “the subdivision developers.”
Dault’s trial brief stated that Clements had created the subdivision and that “the realtor purchasers of the platted subdivision hired a local earth mover to construct [the] trail.” At trial Dault introduced a number of deeds and a real estate contract into evidence, covering subdivision Lots 26, 29, 30, 31, 32, 33, and 35, all reflecting conveyances by the realtor-developers (beginning in 1967); these documents also reflect the realtor-developers’ specific reservation of a 20-foot-wide right-of-way easement on the north half of the lots, consistent with the trail location. Dault also introduced into evidence a 2005 deed covering Lot 27, reflecting a sales transaction by the then-current owners but referencing a 20-foob-wide right-of-way easement on the north half of the lot that had been reserved in an earlier deed by the realtor-developers.
Conspicuous by its absence from the record is a deed showing or suggesting that the realtor-developers ever owned Dault’s Lot 28. The only deed for Lot 28 in the record is *97 the deed by which Dault came into title. That deed is notable for its lack of reference to a 20-foot-wide right-of-way easement reserved by the realtor-developers. Dault testified at trial that to his knowledge there had never been such a reserved easement on Lot 28, and he identified his predecessors in title as first the Habersetzers and previous to them George Stepanov. He believed Stepa-nov got the property “back in '65.”[5]
The trial court’s finding of acquiescence rested on this factual record:
First, and perhaps most important, there was absolutely no evidence that the original owner of lot 28 had any conversation whatsoever with [Shaw’s mother (his immediate predecessor in title) ] regarding her right to use the trail as her driveway to her lots. Nor is there any evidence that [Shaw’s mother or Shaw] ever acknowledged to that person that her use “was in subordination to” that owner’s title. There accordingly is no evidence to counter the claim by [Shaw] and his brother that they always assumed they had the right to cross the property and that no one really cared whether they did so.
The trial court also responded as follows to Dault’s arguments about how the community generally understood the trail’s nature:
There is a further and more substantial difficulty with [Daults’] analysis. The evidence regarding what was done on [other] properties pertains only to those properties — it speaks nothing about what the owner of lot 28 had in mind.
As the party who would have benefitted from demonstrating that the realtor-developers owned Lot 28 when they bulldozed the trail across it, Dault had the burden of producing that evidence; he knew the importance of the information, and he obviously researched his chain of title. Robert Dob-son’s testimony about his personal 1968 understanding that the realtor-developers owned the subdivision is not much support for the court’s proposition that it is undisputed that the realtor-developers owned Lot 28 when they bulldozed the trad across it. [1] If the court’s proposition were true, there would have been no need for Dault to press *98 his argument about an alleged community understanding that use of the trail was authorized but temporary. Dault pressed that argument because he could not prove that a predecessor in title played any part in bulldozing the trail across Lot 28 and he needed to cast doubt on Shaw’s evidence that Shaw’s predecessors used the trail across Lot 28 as if it were their own.
There is no place in the trial court record where either Dault or Shaw asserted that the realtor-developers owned Lot 28 when they bulldozed the trail across it. There is no place in the trial court record where either Dault or Shaw asserted that the realtor-developers had the consent of Lot 28’s owner when they bulldozed the trail. There is no place in the appellate briefing before us where either Dault or Shaw makes these assertions. Yet the court today finds it undisputed that the realtor-developers owned Lot 28 when they bulldozed the trail.
It is undisputed that Clements was the one and only subdivider. It is undisputed that Clements sold lots to the realtor-developers, although we do not know when; and that they bulldozed the trail across a number of lots in the subdivision, including Lot 28, although we do not know when. It is undisputed that for lots the realtor-developers purchased, bulldozed the trail over, and then sold, they reserved a 20-foot-wide right-of-way easement along the bulldozed trail. It is undisputed that no such easement burdens Lot 28.
But it is not undisputed that an owner of Lot 28 played a part in bulldozing the trail and therefore gave permission for others to use it. To the contrary, given Dault’s own testimony and the lack of a reserved easement on Lot 28, evidence in the record supports both the trial court’s implicit finding that the realtor-developers did not own Lot 28 when they bulldozed the trail and its express finding that there was no evidence the owner of Lot 28 said or did anything with respect to the trail bulldozed across Lot 28. The trial court weighed the evidence actually presented and obviously concluded that the realtor-developers did not have ownership of Lot 28 when they bulldozed the trail; otherwise Dault would have prevailed at trial. The court today wrongfully reweighs the evidence and concludes Dobson’s understanding, that when he bought his lot in 1968 the realtor-developers owned the subdivision, not only outweighs Dault’s own testimony about the specific chain of title to Lot 28, but is so dispositive that it is indisputable proof that the realtor-developers owned Lot 28 when they bulldozed the trail.
Ownership of Lot 28 when the trail was bulldozed was critical to the issue of permission versus acquiescence, and it was not an undisputed fact simply forgotten or overlooked by the parties or the trial court. The trial court heard the evidence and made a finding of fact that should be reviewed only for clear error. This court does a disservice to the parties and the trial court by abandoning its normal course of appellate review and becoming its own fact-finder, here finding as a matter of “undisputed” fact, despite the evidence and the parties’ litigation strategies to the contrary, that the realtor developers owned Lot 28 when they bulldozed the trail across it. There is no such undisputed fact, only the court’s mistaken assumption of a fact not in evidence.
I dissent.
APPENDIX A
*99 [[Image here]]
APPENDIX B
IN THE SUPERIOR COURT FOR THE STATE OF ALASKA THIRD JUDICIAL DISTRICT AT PALMER
EDWARD SHAW, Plaintiff, v. JAMES DAULT and SHALA DOBSON, Defendant.
Case No. 3PA-10-1559 Cl
*100 ORDER
Trial was held in this case on March 7-9 and 16, 2011. All parties were present, represented by counsel. Having heard the evidence, the court finds that plaintiff has demonstrated by clear and convincing evidence that he has a prescriptive easement to the driveway crossing defendants’ land to his property. The court further finds that plaintiffs claim should not be dismissed for failure to join indispensable parties or for laches.

Factual Background

Plaintiff Edward Shaw owns lots 33 and 34 in the North Shore Subdivision. Defendants James Dault and Shala Dobson own lot 28 in that subdivision. Mr. Shaw accesses his property by means of what he terms a “driveway” and what defendants term a “trail” that crosses defendants’ property. He claims that he has a prescriptive easement granting him a property right in the driveway; he seeks declaratory relief to that effect, as well as an injunction ordering defendants to remove the obstruction they have placed on the access.
North Shore Subdivision is located on the north shore of Blodgett Lake. It basically consists of a ridge with very steep sides that go down to the lake to the south and a somewhat swampy area to the north. North Shore Drive was originally platted to go through the swampy area below the ridge — it was not very drivable when the subdivision was first offered for sale in the 1960’s, and little maintenance was done on the road for many years.
The subdivision developer bulldozed a trail along the ridge itself so that prospective buyers could gain access to the property. That trail was used by persons who bought lots in the subdivision. Since the trail went through each lot, rather than along one side, the people who bought lots generally moved the trail to the side so they could build a house. Several landowners in fact filled in the area platted as North Shore Drive, effectively upgrading the road and making it more passable. These landowners, including Gordon Benedict, who bought lot 40, used the trail for access until the road was redone in a way that made it usable. The use of the trail necessarily meant that people in the further lots were crossing the lots of those closer to the beginning of the subdivision.
The court heard a considerable amount of credible evidence that the owners of lots 22 through 26 took a lot of surface gravel off the ridge to flatten it, thereby effectively eliminating the trail. That gravel was placed in the right of way platted as North Shore Drive. As best the court can determine, North Shore Drive was relatively passable sometime in the mid-1990’s. There apparently was no objection from anyone who used the trail when these landowners eliminated the trail and required those passing through to drive on North Shore Drive.
Alice Tauscher, plaintiffs mother, bought lots 33 and 34 in 1988. There was a building on those lots, which Ms. Tauscher upgraded to some extent. While the parties greatly dispute the extent to which she and plaintiff lived there over the next 20 years, there is no dispute that she accessed these lots through the trail that had been bulldozed by the original developer, as modified by the landowners in the lots over which she crossed to get to her property.
As noted above, the trail effectively was eliminated up through lot 26. The trail did remain on lots 27-35 — it took off up the hill on lot 27, and then crossed the other lots, ending around lot 35 and passing directly in front of the Kreins’ residence on lot 32 and Ms. Tauscher’s residence on lots 33 and 34. Some work was done in 1997 to flatten lot 27, and the trail apparently was moved somewhat as a result. In addition, at approximately the same time, a parking lot was constructed next to the trail on lot 28. But the basic contours of the trail remained as they had been since the time the trail was built.
Ms. Dobson’s father bought lot 23 in 1968 and built a house there that his family mostly used in the summers. Ms. Dobson and her husband, Mr. Dault, spent time with the family there. They purchased lot 35 in 1997, planning to build a house there. At some point, they decided to bring in heavy equipment to flatten the ridge, so they could in *101 stall a septic. They went to speak with Ms. Tauscher about these plans, and had what they termed a cordial discussion with her. But after they started construction, Mr. Shaw told them not to cross his property. They honored that request, so they put in a driveway and cleared the top of the ridge.
Defendants purchased lot 28 in 2006 with the intention of putting in a ranch house there. They did not think that Ms. Tauscher would object to their plan. In 2009, they built a driveway to that lot, as well as a shed that partially blocked the trail.
Ms. Tauscher died in 2007, leaving the house to plaintiff. Plaintiff was incarcerated at the time. He and his brother, Michael Shaw, decided to put the property up for sale. Michael went to the property in July 2009 for this purpose and found the driveway blocked. Hearing chainsaws up the driveway, he walked up and found Mr. Dault clearing the land for his driveway. The two men had a somewhat acrimonious discussion, during which, according to Michael Shaw, defendants agreed to talk to the Borough about their plans. Michael Shaw and Mr. Dault spoke again a few weeks later; Mr. Dault said he had been too busy to speak with the Borough.
Plaintiff sent a letter to defendants in April 2010 demanding that they remove the obstruction. When defendants did not do so, plaintiff filed this action on May 12, 2010.

Analysis

[[Image here]]

Prescriptive easement

The central issue in this case is whether plaintiff has demonstrated that he is entitled to a prescriptive easement to access his property using what he terms the driveway across lot 28.
To be entitled to a prescriptive easement, a party must prove (1) continuity — that the use of the easement was continuous and uninterrupted; (2) hostility — that the user acted as the owner and not merely one with the permission of the owner; and (3) notoriety — that the use was reasonably visible to the record owner. A claimant must prove each element by clear and convincing evidence. Finally, a claimant must have engaged in the adverse use for at least ten years.
McDonald, 978 P.2d at 83 (citations deleted). The court will address each criterion in turn. The court will then evaluate defendants’ related claim that plaintiff has failed adequately to define the scope of the easement.

Continuity

The Alaska Supreme Court stated in McDonald that in determining whether a person has made continuous and uninterrupted use of an easement, the court may look to “whether the adverse possessor has used and enjoyed the land as ‘an average owner of similar property would use and enjoy it.’ ” Id. (citation omitted). Plaintiff has provided clear and convincing evidence that he and his mother used the easement in the same manner an average owner of a similarly located parcel, and that he did so for more than ten years.
Plaintiff presented highly credible testimony from himself, his brother, his ex-wife, and a girlfriend who lived with him at the house that he and his mother continuously used the driveway to get to the house since his mother purchased the property in 1988. In particular, plaintiff and his brother credibly testified that the house was her primary place of residence until she passed away in 2007, with the exception of a brief period of time when plaintiff and his wife lived there. Plaintiffs ex-wife and girlfriend corroborated that testimony, although the girlfriend was somewhat confused as to the exact years involved after 2004. That testimony was further corroborated by Mr. Benedict and his son, both of whom stated that they saw plaintiffs mother going to the house, that they plowed the driveway at times, that they saw tire tracks going up there in the snow, and that they saw vehicles stuck in the ditch along the driveway.
Defendants contested this testimony by presenting evidence from other people with dwellings in the subdivision that they rarely saw plaintiff or his mother at the house. The problem with this testimony is two-fold. *102 First, plaintiff was in and out of jail throughout these years, and his mother spent much of that time working a two-week on/two-week off schedule. Second, and more important, with the exception of Mr. Benedict, all of these individuals did not live in the subdivision full-time — they primarily were there during the summer and occasionally during the winter. The court also notes that with the exception of the Kreins, all of these lot owners lived along Lake Shore Drive, and so would only have seen plaintiff and/or his mother driving by on that road, rather than across then- property. It therefore is not surprising that the other lot owners did not see plaintiff or his mother very much.
Defendants also suggest that any use of the driveway could not have been continuous in view of plaintiffs incarceration and the fact that Ms. Tauscher was on the Slope half of each month. They also note that the driveway was unplowed for what they believe to be significant periods of time. But “to establish abandonment the period of non-use must indicate that the adverse user had ceased his use and claim.” Swift v. Kniffen, 706 P.2d 296, 304 (Alaska 1985). There is no such showing here — after all, the average lot owner who works on the Slope will only be present at the lot when not working; the same is true for a person who has had difficulties with the law.
Nor does the fact that the road was un-plowed at times prove a lack of use. The Alaska Supreme Court addressed this point directly in Swift:
The fact that the road was sometimes unplowed and impassable for weeks at a time does not signify either abandonment or interrupted use. First, failure to plow and use a road for a few weeks in winter in Fairbanks does not demonstrate that the Swifts no longer intended to use the road as an alternative route to their property. Second, interruption of possession or use must be caused by the record owner or third parties. The Swifts’ use of the roadway was not interrupted until the fall of 1981, when the Kniffens physically blocked the roadway. Prior to that time, the Knif-fens apparently posted signs warning against trespassing and ran an advertisement. These acts, however, were not sufficient by themselves to interrupt the Swifts’ adverse use. The roadway’s closure due to snowfall cannot be considered an interruption because it was not caused by the Kniffens or Fairhill.
Id. (citations omitted). The same logic applies here.
Defendants contend finally that the alterations made to the trail on lots 27 and 28 interrupted the continuous use of the trail as access to lots 33 and 34. The fact that these changes were made does not, of itself, mean that plaintiffs use was not continuous. Hansen v. Davis, 220 P.3d 911, 916 (Alaska 2009) (“Indeed, so long as the use is consistent with the rights granted in the easement, the owner of a servient estate may make substantial use of the easement area.”). Rather, those changes must somehow affect the use of the trail for its intended purpose of access to plaintiffs lots.
The evidence at trial was directly to the contrary. The change to the trail on lot 27 was rather minor and did not impede access to plaintiffs lot. The modification on lot 28 consisted of a parking lot, which again did not impede access. And since access was not blocked, the adverse use of the trail by plaintiff and his mother was not interrupted. Swift, 706 P.2d at 304.
For these reasons, plaintiff has proven by clear’ and convincing evidence that he and his mother used the trail as their driveway continuously from 1988 through at least 2007, a period of more than 10 years.[1] Plaintiff therefore has met the first criterion to demonstrate a prescriptive easement.

Hostility

The Alaska Supreme Court set forth the applicable analysis relating to hostility in McDonald:
*103 The hostility requirement, however, is “determined by application of an objective test which simply asks whether the possessor acted toward the land as if he owned it, without the permission of one with legal authority to give possession.” Still, we will presume that the use of land by an alleged easement holder was permissive unless a claimant proves “a distinct and positive assertion of a right hostile to the owner.” But this presumption does not arise if “a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate.”
978 P.2d at 84-85 (citations omitted). The Court relied primarily on McGill v. Wahl, 839 P.2d 393, 397-98 (Alaska 1992), in this respect, in which the Court held:
However, in this case it would be inappropriate for us to presume that the Wahls were acting as merely permitted users of the roadway. Such a presumption does not arise where a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate. Richardson v. Brennan, 92 Nev. 236, 548 P.2d 1370,1372 (1976).
Both of these eases involved an allegation of a prescriptive easement by a person whose driveway crossed the property of another person. The Court essentially held that in such cases, hostility is presumed and generally can only be rebutted by an affirmative act by the landowner of the subservient estate. As the Court explained in McGill:
The roadway originally was and continuously has been used as access to the lots behind the McGills’ property. The roadway existed and was used by the Neis Wahls before the McGills came to the property. Although other lot owners now use Highway 1 to get to their lots, the use of the roadway has never changed with respect to lot 11. The McGills, having come to land burdened by the roadway, cannot now claim that the users of the roadway were acting merely with their permission. Likewise, the McGills without any affirmative action cannot now claim that they intended to permit the use of the road by the other landowners.

Id.

This case is virtually identical to McDonald and McGill. There is no dispute that Ms. Tauseher and plaintiff crossed lot 28 solely for the purpose of gaining access to their property. Defendants came to lot 28 well after that use began. And they took no affirmative action to block the access until 2009. Plaintiffs use therefore was hostile.
The court would reach the same conclusion even absent the presumption. In determining whether a use is hostile, the court must look to whether the owner of lot 28 gave his or her permission to use the trail or merely acquiesced in that use. In particular, as the Alaska Supreme Court explained in Tenala, Ltd. v. Fowler, 921 P.2d 1114, 1120 (Alaska 1996):
In Swift v. Kniffen, 706 P.2d 296, 304 (Alaska 1985), we stated that “[t]he hostility element turns on the distinction between acquiescence and permission,” and held that if the true owners merely acquiesce, and do not intend to permit a use, the claimant’s use is adverse and hostile. Therefore, we must decide whether the record reveals that Tenala intended to permit the Mayos’ use or merely acquiesced in that use. In Hubbard v. Curtiss, 684 P.2d 842, we stated that “[t]he key difference between acquiescence by the true owner and possession with the permission of the true owner is that a permissive use requires the acknowledgment by the possessor that he holds in subordination to the owner’s title.” Id. at 848 (citations omitted).
The evidence here supports a finding of acquiescence by clear and convincing evidence. First, and perhaps most important, there was absolutely no evidence that the original owner of lot 28 had any conversation whatsoever with Ms. Tauseher regarding her right to use the trail as her driveway to her lots. Nor is there any evidence that Ms. Tauseher or plaintiff ever acknowledged to that person that her use “was in subordination to” that owner’s title. There accordingly is no evidence to counter the claim by plaintiff and his brother that they always assumed *104 they had the right to cross the property and that no one really cared whether they did so.
Defendants argue that the pattern of activity in the subdivision indicates that everyone there understood that any use of the trail was by consent of the landowner. According to defendants, the practice there was that the trail would only be used until the property was developed, at which time the landowner was entitled to remove the trail with the expectation that he or she would put in his or her own driveway. Defendants assert that this expectation entails that any use of the trail was at the sole discretion and permission of each landowner.
The evidence at trial leads to a different conclusion. There is no question that the trail cut across the lots in a manner that rendered them undevelopable were the trail to remain where it was. But the properties were developed in a manner such that access to the other lots was guaranteed to those other lot owners. In particular, each person moved gravel from their property and filled in North Shore Drive, thereby enabling other people to drive past the lot and gain access. This indicates that to the extent there was an expectation in the community, the implicit understanding was the access would not be precluded, it would just be changed. The fact that these other properties were developed in a manner that destroyed the trail therefore does not entail that use of the trail was permissive.
There is a further and more substantial difficulty with defendants’ analysis. The evidence regarding what was done on these properties pertains only to those properties — it speaks nothing about what the owner of lot 28 had in mind. And at most, that evidence indicates only that those landowners were interrupting a use, not that they intended only to permit the use. As such, what was done on these other lots has relatively little bearing on the use plaintiff and his mother made on lot 28.
Defendants point finally to what they term three admissions by Ms. Tauscher and plaintiff that her use was permissive. According to Mr. Dault, the first occurred during a conversation he had with Ms. Tauscher about his plans to level lot 35 and put in a driveway and a septic. Mr. Dault testified on direct that they had a pleasant conversation for about 10-15 minutes on this topic, during which Ms. Tauscher expressed some concern about having to put in her own driveway and acknowledged that anyone could block her access to her home. The court did not find this testimony credible for two reasons. First, Mr. Dault admitted on cross-examination that in his deposition, he stated that he never “broached” the topic of a driveway at all; his efforts to explain this discrepancy were not convincing. Second, Michael Shaw testified credibly that his mother made it very clear that she did not like Mr. Dault, due to that very conversation, and that he had never heard his mother say anything about putting in a driveway or about some community understanding as to the use of the trail. Taken together, these considerations lead the court to conclude that the topic of access was not discussed when Mr. Dault met with Ms. Tauscher, much less that she conceded that her use was permissive.
The second apparent admission by Ms. Tauscher was during a conversation with Carol Krein, who owned a cabin on lot 32. Ms. Krein testified that she told Ms. Tauscher that she was thinking about expanding her house and putting in a septic, which would mean that she would have to block the trail leading to Ms. Tauscher’s house. According to Ms. Krein, Ms. Tauscher stated that she was “fine with that.” Ms. Krein admitted on cross-examination, however, that her affidavit did not use the words “fine with that.” Having heard the testimony and reviewed the affidavit, the court concludes that Ms. Tauscher did not voice any objection to Ms. Krein’s plans. But this does not mean that Ms. Tauscher thereby made some binding admission that she was not entitled to use the trail as her driveway. These two women were neighbors. Ms. Krein testified that her plans were very vague, and there is no reason not to conclude that Ms. Krein made that point to Ms. Tauscher. Under these circumstances, there was no reason for Ms. Tauscher to get in a fight with her neighbor on the basis of a general statement that perhaps Ms. Krein would have to block the driveway. *105 The court also notes that given the description given of Ms. Tauscher by all the witnesses it is unlikely that she was well versed in the law of prescriptive easements.
The final admission upon which defendants rely is a refusal by plaintiff and his wife to allow Mr. Dault to cross their property to do work on lot 35. Defendants contend that this indicates that even plaintiff viewed the trail as their property and not subject to an easement by those seeking access to a further lot. But defendants read too much into this incident. As noted above, Ms. Tauscher was annoyed at Mr. Dault, a feeling shared by plaintiff. Plaintiffs action therefore was not an admission so much as an effort to keep defendants away. The court doubts very much that the issue of some prescriptive right was going through anyone’s mind at the time of that particular dispute. The court also notes that defendants had only recently purchased lot 35, and so would have had some difficulty making a viable claim of access across any of the other lots under a prescriptive easement theory.

Notoriety

In order to demonstrate that a use is notorious, “the adverse user need not demonstrate that the record owner had actual knowledge of the adverse party’s presence. The adverse user must show only that a duly alert owner would have known of the adverse presence.” McDonald, 978 P.2d at 85 (footnotes deleted.) Plaintiff has met his burden in both respects here. No one denied that Ms. Tauscher and plaintiff used the trail as their driveway. Indeed, there was ample testimony that both individuals had been seen using the driveway on many occasions. In addition, there were tire tracks and footprints in the snow leading up to the house, and vehicles were seen stuck in the ditch at the bottom. All of these factors indicate both that the owner of lot 28 had actual knowledge of the presence of Ms. Tauscher and plaintiff and that a duly alert owner would have known of their presence. Plaintiff therefore has demonstrated by clear and convincing evidence that his and his mother’s use of the driveway was notorious.

Scope of the easement

Defendants assert that plaintiff did not present any evidence as to the scope of the easement, both with respect to the actual size of the easement and to allowed uses of the easement. There was, however, extensive evidence that the portion of the trail that was used as plaintiffs driveway was readily apparent on the ground, which means that both defendants and any user of the easement are on notice as to what portion of lot 28 is covered by the easement. With respect to use, the easement is claimed as a driveway, which reasonably entails use for access to the property by the lots’ owner and guests, as well as reasonable maintenance so that the driveway can continue to be used as a driveway. It is unclear to the court just what more is required, given that the trail has been used as a driveway for many years and everyone in the area seems to know full well just what the trail is and how it has been used.
[[Image here]]

Relief

Plaintiff requests a declaratory judgment that he is entitled to a prescriptive easement for the portion of the trail that has been used as his driveway. Plaintiff also requests both an injunction directing defendants not to obstruct the easement and an order directing them to remove any obstructions. Since plaintiff has demonstrated by clear and convincing evidence that he has a prescriptive easement consisting of that portion of the trail he has used for his driveway across lot 28, he is entitled to the relief he has requested.
The court feels constrained to note, however, that while plaintiff has thereby won this battle, it is not at all clear that this is the best result long-term for any of the parties. Because the trail crosses defendants’ property in a manner that makes it very difficult to develop, plaintiffs use of the trail will create ongoing difficulties with his neighbor. It seems to the court that this is a matter that can and should have been resolved through settlement in a manner that assured plaintiff access and defendants full use of their land. The court encourages the parties to explore *106 settlement in lieu of any further legal proceedings.

Conclusion

For the foregoing reasons, it is ORDERED that:
1.Plaintiff has a prescriptive easement consisting of that portion of the trail crossing lot 28 that he has used as his driveway to access lots 33 and 34.
2. Defendants may not obstruct plaintiffs easement in any manner.
3. Defendants shall remove any obstruction to the easement within 60 days of the date of distribution of this order.
Dated at Palmer, Alaska this 25th day of April, 2011.
/s/
ERIC SMITH
SUPERIOR COURT JUDGE
APPENDIX C
*107 [[Image here]]
*108 [[Image here]]
*109 ⅜⅝⅛. ⅜⅛0⅜, UNIT NO; ⅞ WORTH SHORE .SM3pl^E?ION MO. 1 accusing to ¾⅝¾⅜⅛ 6&SS, .⅞⅞⅜⅜⅛ A TsftnisiSp IT14d% Range 2 West ⅜⅞⅞⅜ istená«n. tocstea in We ?A)sr-R»cc«3inf ⅜½⅜'1¾⅜ ⅛⅛⅛! Distrfcv, ¾«⅞ « Alaska. ⅞⅛, ..⅜⅛⅝* ^ . ... TV5JO⅜& T^. ⅜#⅜⅜,⅞⅜4 ⅛⅛⅛⅞⅜», Aiasta APRS RECTiEIIK© Seel® »; ⅝⅜⅞⅛ Csltef ⅛ ?OB®u’t2M3 ⅛⅛⅜⅜¾⅞*. AK ,⅜5¾| ¾1'⅛⅞⅛7£⅜⅜⅝⅞ ?/&/></
*110 [[Image here]]
*111 [[Image here]]
*112 [[Image here]]
*113 [[Image here]]
*114 [[Image here]]

.978 P.2d 81, 84-85 (Alaska 1999) (describing general presumption of permission for adverse use of land and exception where "a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate” (citing and quoting McGill v. Wahl, 839 P.2d 393, 397-98 (Alaska 1992))). We never have expressed the reverse presumption stated by the trial court, but the court today does not question it.

. Id. at 84 ("The hostility requirement ... is 'determined by application of an objective test which simply asks whether the possessor acted toward the land as if he owned it, without the permission of one with legal authority to give possession.’ ” (emphasis in original) (quoting Nome 2000 v. Fagerstrom, 799 P.2d 304, 310 (Alaska 1990))).

. Op. 93.

. Op. 86-87.

. The State of Alaska, Department of Natural Resources, maintains an on-line data bank of recorded real property transactions, and the recorded transaction documents are readily accessible public records subject to judicial notice. More than a century ago, the United States Supreme Court held that, “[wjhile it is ordinarily true that this court takes notice of only such facts as are found by the court below, it may take notice of matters of common observation, of statutes, records, or public documents which were not called to its attention, or other similar matters of judicial cognizance.” N.Y. Indians v. United States, 170 U.S. 1, 32, 18 S.Ct. 531, 42 L.Ed. 927 (1898). A half-century later, the United States Court of Appeals for the Tenth Circuit echoed this principle when it held, "[wjhether an appellate court will for the first time take judicial notice of a judicially notable fact rests largely in its own discretion. There are numerous cases in which appellate courts have reversed the lower courts by taking judicial notice for the first time on appeal of a fact which was not called to the attention of the trial court.” Mills v. Denver Tramway Corp., 155 F.2d 808, 812 (10th Cir. 1946). And the United States Court of Appeals for the Sixth Circuit has held that "it [is not] necessary that the Court be requested to take judicial notice of a fact before it is authorized to do so. The Court may take judicial notice sua sponte.” United States v. Harris, 331 F.2d 600, 601 (6th Cir. 1964) (citing Weaver v. United States, 298 F.2d 496, 498 (5th Cir. 1962)).
Palmer Recording District records show the following series of conveyances recorded for Lot 28: on January 22, 1974 at Book 79, Page 294, a January 1974 Executor's Deed from the Estate of Helen P. Clements to George A. and Lora Stepa-nov, as tenants by the entirety; on August 2, 2004 as Document 2004-021192-0, a Corrected Clerk’s Deed conveying Lora Stepanov’s interest to George A. Stepanov; on August 2, 2004 as Document 2004-021193-0, a Statutory Warranty Deed from George Stepanov to Douglas L. and Donna M. Habersetzer, as tenants by the entirety; and on December 29, 2006 as Document 2006-036772-0, a Warranty Deed from Douglas L. and Donna M. Habersetzer to James M. Dault and Shala Dobson, as tenants in common. (Document copies are attached in order as Appendix C to today’s decision.) Due to the poor scanning quality of older documents for the Palmer Recording District, I was unable to locate recorded documents for Clements’s transaction(s) with the realtor-developers or for Clements’s earlier transaction with Stepanov.
It is sufficient for this dissent to take judicial notice of these recorded deeds for the limited purposes of supporting Dault’s own testimony about the chain of title for his Lot 28, which the court fails even to acknowledge, and contradicting the court’s factual determination the realtor-developers indisputably owned Lot 28 when they bulldozed the trail across it.

. Defendants do not directly assert that the use was abandoned once Ms. Tauscher passed away in 2007, nor could they do so. Plaintiff was incarcerated for part of the time after she dies, and he and his brother decided to put the property up for sale. This latter action entails that plaintiff never abandoned or had any intent to abandon his use of the driveway.